# IN THE SUPREME COURT OF CALIFORNIA

NATIONWIDE BIWEEKLY ADMINISTRATION, INC., et al.,
Petitioners,

v.

THE SUPERIOR COURT OF ALAMEDA COUNTY,
Respondent;

THE PEOPLE,
Real Party in Interest.

S250047

First Appellate District, Division One
A150264

Alameda County Superior Court
RG15770490

April 30, 2020

Chief Justice Cantil-Sakauye authored the opinion of the
Court, in which Justices Chin, Corrigan and Groban concurred.

Justice Kruger filed a concurring opinion, in which Justices
Liu and Cuéllar concurred.

NATIONWIDE BIWEEKLY ADMINISTRATION, INC. v.
SUPERIOR COURT

S250047

Opinion of the Court by Cantil-Sakauye, C. J.

Under two of California's most prominent consumer protection statutes — the unfair competition law (UCL)[1] and the false advertising law (FAL)[2] — the Attorney General or local prosecuting authorities may bring a civil action against a business that has allegedly engaged in an unfair, unlawful or deceptive business act or practice or false or misleading advertising and may obtain civil penalties as well as injunctive relief and restitution in such an action. In this case we must decide whether, when the government seeks civil penalties as well an injunction or other equitable remedies under those statutes, the causes of action are to be tried by the court (that is, the trial judge) or, instead, by a jury.

For more than 45 years, a uniform line of California Court of Appeal decisions has held that such causes of action under the UCL and FAL are to be tried by the court rather than by a jury.

---

[1] The unfair competition law is set forth at Business and Professions Code section 17200 et seq. Although the Legislature has not given an official name to these statutory provisions, the legislation has generally been referred to as the unfair competition law, and we will refer to this statute as the UCL. (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 169, fn. 2.)

[2] The false advertising law (FAL) is set forth at Business and Professions Code section 17500 et seq.

In the current writ proceeding in this case, however, the Court of Appeal, relying primarily on a decision of the United States Supreme Court applying the civil jury trial provision of the Seventh Amendment to the federal Constitution — *Tull v. United States* (1987) 481 U.S. 412 (*Tull*) — disagreed with the earlier line of decisions and held that the jury trial provision of the California Constitution should be interpreted to require a jury trial in any action brought under the UCL or FAL in which the government seeks civil penalties in addition to injunctive or other equitable relief.  We granted review to resolve the conflict in the Court of Appeal decisions.

For the reasons discussed hereafter, we conclude that the causes of action established by the UCL and FAL at issue here are equitable in nature and are properly tried by the court rather than a jury.  As we explain, the legislative history and underlying purpose of the statutory provisions in question demonstrate that these very broadly worded consumer protection statutes were fashioned to permit courts to utilize their traditional flexible equitable authority, tempered by judicial experience and familiarity with the treatment of analogous business practices in this and other jurisdictions, in evaluating whether a challenged business act or practice or advertising should properly be considered impermissible under these statutory provisions.

With regard to petitioners' constitutional claim, it is firmly established that California's constitutional jury trial provision preserves the right to jury trial in civil actions comparable to those *legal* causes of action in which the right to jury trial existed at the time of the first Constitution's adoption in 1850 and does not apply to causes of action that are *equitable* in

nature. At early common law, "legal" causes of action (or "actions at law") typically involved lawsuits in which the plaintiff sought to recover money damages to compensate for an injury caused, for example, by the defendant's breach of contract or tortious conduct, whereas "equitable" causes of action (or "suits in equity") sought relief that was unavailable in actions at law, such as an injunction to prohibit ongoing or future misconduct or an order requiring a defendant to provide specific performance or disgorge ill-gotten gains. The consumer protection statutory causes of action at issue here are quite different from any early common law cause of action that was in existence at the time the civil jury trial provision of the California Constitution was first adopted. Given the nature of the substantive standard to be applied and the remedies afforded by the statutes, we conclude that the gist of both the UCL and FAL causes of action at issue here is equitable and consequently such actions are properly tried by the court rather than by a jury.

As further explained, the United States Supreme Court decision in *Tull*, *supra*, 481 U.S. 412, relied upon by the Court of Appeal below, does not govern this case for a variety of reasons. To begin with, the *Tull* decision rests upon the federal high court's interpretation of the civil jury trial provision of the Seventh Amendment to the federal Constitution, and that court's decisions explicitly hold that the Seventh Amendment applies only to *federal court* proceedings, not *state court* proceedings. The constitutional right to jury trial in *state court* civil proceedings is governed only by the civil jury trial provisions of each individual state's own state constitution. In several important respects, California decisions have construed

the civil jury trial provision of the California Constitution in a manner differently from how the federal high court has interpreted the federal civil jury trial provision. These differences are significant in this context and serve to distinguish the *Tull* decision from this case. Second, unlike the broad, flexible standards embodied in the two consumer protection statutes at issue in this case, there is no indication that the relevant substantive statutory standard at issue in *Tull* called for the exercise of a court's traditional equitable authority and discretion in determining whether a violation of the statute had occurred. Accordingly, the court in *Tull* had no occasion to determine how the federal constitutional civil jury trial provision should be interpreted or applied in such a setting.

Because the nature of the substantive statutory standards and remedies embodied in the civil causes of action under the UCL and the FAL establish the equitable nature of the actions, we limit the holding in this case to the UCL and FAL setting and express no opinion regarding how the state constitutional jury trial right applies to other statutory causes of action that authorize both injunctive relief and civil penalties.

## I. FACTS AND PROCEEDINGS BELOW

Petitioners Nationwide Biweekly Administration, Inc., Loan Payment Administration LLC, and Daniel S. Lipsky, the alleged alter ego, principal and sole shareholder of both entities (hereafter collectively referred to as Nationwide) operated a debt payment service in California and other states. Nationwide's program claimed to save debtors money through a process in which the debtor would reduce the amount of interest owed over the life of a loan by having the debtor accelerate the repayment of the debt through an extra monthly payment each

4

year. Under the program, a debtor would pay to Nationwide one-half the debtor's ordinary monthly loan payment every two weeks (biweekly) rather than one full payment once a month, resulting in an extra month's payment each year (26 half-payments equal 13 full payments), and Nationwide would in turn pay those amounts to the debtor's lender. Nationwide advertised its services statewide, mostly through direct mailers to consumers with outstanding residential mortgages, and through follow-up telephone conversations with consumers who responded to the mailers.

In May 2015, the district attorneys of four counties, acting on behalf of the People, filed a civil complaint alleging that Nationwide had violated the UCL and FAL by, among other things, employing business practices that: (1) misleadingly implied that Nationwide was affiliated with the consumer's lender; (2) disguised the amount that Nationwide's services actually cost by failing to fully and adequately disclose the amount, payment schedule, and effect of Nationwide's fees; and (3) overstated the amount of savings a consumer could reasonably expect to receive through Nationwide's services.[3] The complaint also stated that Nationwide's practices have been

---

[3] As initially filed, the complaint also alleged that Nationwide's practices violated the Check Sellers, Bill Payers, and Proraters Law (Fin. Code, § 12200 et seq.) and asserted causes of action under that statute. While this case was pending before this court, those causes of action were dismissed as part of a larger settlement between the Department of Business Oversight and Nationwide. The underlying action now rests solely on the causes of action under the UCL and FAL set forth in the complaint.

the subject of numerous consumer complaints and regulatory and law enforcement activities around the country, including an action brought by the federal Consumer Financial Protection Bureau (CFPB).[4]

The complaint's prayer for relief requested that the court (1) issue an injunction prohibiting the business practices found to violate the provisions of the UCL or FAL, (2) order restitution of all money wrongfully acquired by Nationwide from California consumers in violation of the UCL and FAL, and (3) impose civil penalties up to $2,500 for each violation of the UCL or FAL found by the court.[5]

---

[4] In the action brought by the CFPB, the federal district court, after a seven-day bench trial, found that although some of the claims advanced by the CFPB were not meritorious, Nationwide had made a variety of misleading statements in its marketing materials. The court imposed injunctive relief and civil penalties of more than $7 million against Nationwide based on that misleading conduct. (*Consumer Financial Protection Bureau v. Nationwide Biweekly Admin., Inc.* (N.D.Cal., Sept. 8, 2017, No. 15-cv-02106-RS) 2017 WL 3948396, pp. *6-9, *12-13.) Both parties filed appeals from the district court's decision, that are pending in the United States Court of Appeals for the Ninth Circuit. (Case Nos. 18-15431 & 18-15887, filed Mar. 15, 2018 & May 10, 2018.)

[5] In the answer brief filed in this court, Nationwide claims that the government seeks to impose "over $19.25 *billion* in civil penalties." The complaint, however, seeks no specific amount in penalties, and, as explained hereafter, the applicable statutes and case law grant trial courts broad, but not unlimited, discretion to impose penalties in a reasonable amount (up to $2,500 per violation) in light of the nature and severity of an offending business' conduct. (*Post*, pp. 13, 28, 38.) The answer's hyperbole in this regard does not advance its legal argument.

In its amended answer to the complaint, Nationwide demanded a jury trial "on all issues so triable," and the People, in response, filed a motion to strike the jury demand "based on well settled law that this is an equity action requiring a court trial." After briefing, the trial court granted the People's motion to strike the jury demand.

Nationwide then filed a petition for writ of mandate in the Court of Appeal, challenging the trial court's ruling striking the jury demand. After the Court of Appeal initially summarily denied the writ petition, this court granted Nationwide's petition for review and retransferred the matter to the Court of Appeal with directions to issue an order requiring the People to show cause why Nationwide does not have a right to jury trial when the government seeks the civil penalties authorized under the UCL and FAL.

After briefing and argument, the Court of Appeal held that under article I, section 16 of the California Constitution — the jury trial provision — Nationwide has a right to a jury trial in this matter and that the trial court erred in striking the jury demand. (*Nationwide Biweekly Administration, Inc. v. Superior Court* (2018) 24 Cal.App.5th 438 (*Nationwide Biweekly*).) The Court of Appeal, relying heavily on the reasoning of the United States Supreme Court's decision in *Tull, supra,* 481 U.S. 412, concluded that because the People are seeking civil penalties as well as injunctive relief and restitution, the "gist" of the People's UCL and FAL causes of action against Nationwide should properly be considered legal rather than equitable, "giving rise to a right to a jury trial" under article I, section 16. (*Nationwide Biweekly, supra,* 24 Cal.App.5th at p. 442.) At the same time, the Court of Appeal, again following the approach adopted by

the United States Supreme Court in *Tull*, held that Nationwide's jury trial right is limited to the issue of liability — that is, to whether Nationwide's business practices violated the provisions of the UCL or FAL — and does not extend to the issue of remedy, including the amount of civil penalties to be imposed. (*Nationwide Biweekly*, at p. 456.)

In the course of its opinion, the Court of Appeal rejected the People's contention that there is " 'an unbroken line of appellate decisions finding no right to a jury trial [under the California Constitution] in UCL or FAL actions . . . where the People sought penalties' " (*Nationwide Biweekly*, *supra*, 24 Cal.App.5th at p. 457), finding instead that most of the cases relied upon by the People held only that such actions under the UCL and FAL were not criminal in nature and thus that the jury trial provision of the Sixth Amendment of the federal Constitution did not apply to such actions. (*Nationwide Biweekly*, at pp. 457-459.) Although the Court of Appeal acknowledged that at least one appellate court decision — *People v. Bhakta* (2008) 162 Cal.App.4th 973 — clearly held that the gist of an action under the UCL is equitable in nature and that there is no right to a jury trial in such an action under the California constitutional jury trial provision, the Court of Appeal disagreed with that decision's analysis and declined to follow its holding. (*Nationwide Biweekly*, *supra*, 24 Cal.App.5th at pp. 459-460.) In addition, the Court of Appeal questioned the validity of another appellate court decision relied upon by the People — *DiPirro v. Bondo Corp.* (2007) 153 Cal.App.4th 150 (*DiPirro*) — which held that there is no right to a jury trial in an action seeking injunctive relief, restitution, and civil penalties under the Safe Drinking Water and Toxic Enforcement Act of

1986 (Health & Saf. Code, § 25249.5 et seq.) (commonly known as Prop. 65). The Court of Appeal found that the *DiPirro* decision had not adequately analyzed the United States Supreme Court's reasoning in *Tull.* (*Nationwide Biweekly*, *supra*, 24 Cal.App.5th at pp. 461-463.)

Accordingly, the Court of Appeal concluded that a writ of mandate should issue, directing the trial court to vacate its order striking Nationwide's request for jury trial and to grant a jury trial on all issues except the amount of any statutory penalties to be awarded. (*Nationwide Biweekly*, *supra*, 24 Cal.App.5th at p. 463.)

We granted the People's petition for review to determine whether there is a right to a jury trial in a UCL or FAL action brought by the government when the government seeks civil penalties as well as injunctive relief and restitution.

## II. GENERAL PRINCIPLES REGARDING THE RIGHT TO JURY TRIAL IN CIVIL CASES UNDER CALIFORNIA LAW

As this court recently explained in *Shaw v. Superior Court* (2017) 2 Cal.5th 983 (*Shaw*): "Under California law, the right to a jury trial in a civil action may be afforded either by statute or by the California Constitution. . . . [¶] As a general matter, the California Legislature has authority to grant the parties in a civil action the right to a jury trial by statute, either when the Legislature establishes a new cause of action or with respect to a cause of action that rests on the common law or a constitutional provision. [Citations.] Given the Legislature's broad general legislative authority under the California Constitution and in the absence of any constitutional prohibition [citations], the Legislature may extend the right to

a jury trial to instances in which the state constitutional jury trial provision does not itself mandate a right to a jury trial. [¶] . . . But even when the language and legislative history of a statute indicate that the Legislature intended that a cause of action established by the statute is to be tried by the court rather than a jury, if the California constitutional jury trial provision itself guarantees a right to a jury trial in such a cause of action, the Constitution prevails and jury trial cannot be denied." (2 Cal.5th at pp. 993-994, fn. omitted.)

### III. IS THERE A *STATUTORY* RIGHT TO JURY TRIAL UNDER EITHER THE UCL OR FAL WHEN THE GOVERNMENT SEEKS CIVIL PENALTIES AS WELL AS INJUNCTIVE RELIEF?

Neither the UCL nor the FAL explicitly addresses the question whether the causes of action created by the two statutes — both of which authorize the government to seek civil penalties as well as injunctive relief and restitution — are to be tried by the court or by a jury. As we shall see, however, the legislative history and legislative purpose of both statutes convincingly establish that the Legislature intended that such causes of action under these statutes would be tried by the court, exercising the traditional flexible discretion and judicial expertise of a court of equity, and not by a jury, including when civil penalties as well as injunctive relief and restitution are sought.

### A. The UCL

Prior to 1933, former section 3369 of the Civil Code provided simply that "[n]either specific nor preventive relief can be granted to enforce a penal law, except in a case of nuisance, nor to enforce a penalty or forfeiture in any case." The current

provisions of the UCL — set forth in Business and Professions Code section 17200 et seq. — derive from a 1933 amendment of Civil Code former section 3369. (Stats. 1933, ch. 953, § 1, p. 2482.) The 1933 amendment broadened the exception in the statute to include "unfair competition" as well as "nuisance" (Civ. Code, former § 3369, subd. (1)) and added additional subdivisions that: (a) provided that "[a]ny person performing or proposing to perform an act of unfair competition within this State *may be enjoined* in any court of competent jurisdiction" (*id.,* subd. (2), italics added); (b) defined "unfair competition" as used in the statute to "mean and include *unfair or fraudulent business practice and unfair, untrue or misleading advertising*" (*id.,* subd. (3), italics added)[6]; and (c) authorized actions for injunction under the statute to be brought "by the Attorney General or any district attorney in this State in the name of the people of the State of California" or by "any board, officer, . . . corporation or . . . person acting for the interests of itself, its members or the general public" (Civ. Code, former § 3369, subd. (5)). Because the unfair competition cause of action established by the 1933 amendment of former section 3369 authorized the government (as well as private parties) to seek only injunctive relief, there is no question that the civil cause of action created in 1933 was equitable in nature and, as such, was intended to be tried by the court and not a jury. (See 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 126, p. 205 ["Actions seeking

---

[6] The 1933 amendment also defined "unfair competition" to include any violation of the then-existing provisions of Penal Code former sections 654a, 654b, or 654c, all of which prohibited different specific forms of false advertising. (Stats. 1933, ch. 953, § 1, p. 2482 [Civ. Code, former § 3369, subd. (3)].)

injunctive relief are, of course, equitable in nature"].) Nationwide does not suggest otherwise.

In 1972, as part of a legislative measure that expanded the reach of former section 3369 of the Civil Code to include "deceptive," as well as "unfair," "untrue," or "misleading," advertising (Stats. 1972, ch. 1084, § 1, p. 2020), the Legislature added former section 3370.1 to the Civil Code, authorizing the Attorney General or any district attorney (but not private parties) to seek and obtain, in addition to injunctive relief, "a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation" of former section 3369 (Stats. 1972, ch. 1084, § 2, p. 2021 [enacting Assem. Bill No. 1937 (1971-1972 Reg. Sess.])).  The 1972 legislation was proposed by the Attorney General and district attorneys who were charged with enforcing the prohibition on unfair competition embodied in former section 3369.  In support of the legislation, the proponents maintained that "[i]t is our experience that an injunction without a civil penalty is not a deterrent to future consumer fraud abuses."  (Atty. Gen. Evelle J. Younger, letter to Sen. Alfred H. Song re Assem. Bill No. 1937 (1971-1972 Reg. Sess.) July 13, 1972.)  A legislative committee analysis of the proposed bill after its final amendment set forth the purpose of the legislation as intended to "[p]ermit the Attorney General and a district attorney to collect civil penalties in addition to either specific or preventive relief in actions they commence to enjoin acts of unfair competition," explaining that "[i]t is felt that the allowance of civil penalties, in addition to the requested injunctive relief, will provide a sufficient deterrent to the resumption of these unlawful practices."  (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1937 (1971-1972 Reg.

Sess.) as amended May 25, 1972, pp. 1, 2.) There is no indication in the legislative history of the 1972 enactment that the Legislature, in providing an additional remedy that could be sought in actions under former section 3369 to enjoin acts of unfair competition, intended to transform such actions from ones that were to be tried by the court into actions that were to be tried by a jury. Civil actions under the UCL that were filed by private parties, in which only injunctive relief was authorized, continued to be tried by the court.

In 1977, the Legislature moved the relevant sections of the Civil Code embodying the unfair competition law into the Business and Professions Code at sections 17200 to 17206. (Stats. 1977, ch. 299, § 1, p. 1202.) Former section 3370.1 of the Civil Code — the section authorizing the Attorney General or a district attorney to seek civil penalties as well as injunctive relief — was moved to Business and Professions Code section 17206. In 1992, the Legislature added subdivision (b) to Business and Professions Code section 17206, which provides in relevant part that "[i]n assessing the amount of the civil penalty, *the court* shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." (Stats. 1992, ch. 430, § 4, p. 1708, italics added.) Nothing in these further amendments suggests that in an action under the UCL in which the government seeks civil penalties as well as injunctive or other equitable relief, the Legislature

intended that the action would be tried by a jury rather than by the trial court, and the language of Business and Professions Code section 17206, subdivision (b) clearly indicates that the amount of civil penalties is intended to be determined by the court.[7]

The factors just discussed — namely (1) the origin of the government's cause of action under the UCL as an action simply to enjoin an unfair business practice and (2) the language of the statutory provision relating to the awarding of civil penalties in such an action — clearly support the conclusion that the Legislature, in enacting the UCL, intended to create an equitable, rather than a legal, cause of action. Furthermore, from the statute's inception, California decisions interpreting and applying both the provisions of former section 3369 and its current counterparts have explained that the exceedingly broad and general language that the Legislature incorporated in the statute to define the business practices that are proscribed by the statute — in the original language, "unfair or fraudulent business practice and unfair, untrue, or misleading advertising" — was adopted with the specific understanding that this broad

---

[7] In the statewide election held in November 2004, the voters approved Proposition 64, an initiative statute that restricted the kinds of private plaintiffs that may seek an injunction or other equitable relief under the UCL or FAL (Bus. & Prof. Code, §§ 17203, 17204, 17535) and provided that the revenue from the civil penalties imposed under the UCL or FAL may be used only by the Attorney General and local public prosecutors for the enforcement of consumer protection laws. (Bus. & Prof. Code, §§ 17206, subd. (c), 17536, subd. (c).) The changes effectuated by Proposition 64 have no direct bearing on the issue before us.

language would be applied *by a court of equity* in determining whether a challenged business practice violated the statutory prohibition.

For example, in *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94 (*Barquis*) — one of this court's seminal decisions applying the UCL — we emphasized that past cases under the statute "have frequently noted that the section was intentionally framed in its broad, sweeping language, precisely to enable *judicial tribunals* to deal with the innumerable ' "new schemes which the fertility of man's invention would contrive." ' " (*Barquis*, at p. 112, italics added.) Quoting from *American Philatelic Soc. v. Claibourne* (1935) 3 Cal.2d 689, 698-699 — one of the earliest decisions discussing the appropriate reach of the broad language of the statute at issue — *Barquis* observed: " 'When a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, *a court of equity* is not impotent to frustrate its consummation because the scheme is an original one. There is a maxim as old as law that there can be no right without a remedy, and in searching for a precise precedent, *an equity court* must not lose sight, not only of its power, but of its duty to arrive at a just solution of the problem.' " (*Barquis, supra*, 7 Cal.3d at p. 112, italics added.)

The objective that the Legislature sought to accomplish through its adoption of the broad standard embodied in the UCL fits perfectly with the role historically exercised by a court of equity. As Pomeroy explained in his classic treatise on equity jurisprudence: "[Equity is] much more elastic and capable of expansion and extension to new cases than the common law. Its very central principles, its foundation upon the eternal verities of right and justice, its resting upon the truths of morality rather

than arbitrary customs and rigid dogmas, necessarily gave it this character of flexibility, and permitted its doctrines to be enlarged so as to embrace new cases as they constantly arose. It has, therefore, as an essential part of its nature, a capacity of orderly and regular growth, — a growth not arbitrary, according to the will of individual judges, but in the direction of its already settled principles. It is ever reaching out and expanding its doctrines so as to cover new facts and relations, but still without any break or change in the principles or doctrines themselves." (1 Pomeroy, Equity Jurisprudence (5th ed. 1941) § 59, p. 76.) As the Court of Appeal observed in *A-C Co. v. Security Pacific Nat. Bank* (1985) 173 Cal.App.3d 462, 473: "The tradition and heredity of the flexible equitable powers of the modern trial judge derive from the role of the trained and experienced chancellor and depend upon skills and wisdom acquired through years of study, training and experience which are not susceptible of adequate transmission through instructions to a lay jury."[8]

---

[8] The very broad consumer protective language set forth in the UCL closely tracks the broad language that Congress embodied in the Federal Trade Commission Act to reach business practices that were not specifically forbidden by the common law or other statutes. (See 15 U.S.C. § 45(a) ["Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce" are declared unlawful]; see generally Baker & Baum, *Section 5 of the Federal Trade Commission Act: A Continuing Process of Redefinition* (1962) 7 Vill. L.Rev. 517, 525-542.) California decisions have long recognized the close relationship between the language of the UCL and the Federal Trade Commission

Over the more than 80-year history of the UCL, scores of decisions of both this court and the Courts of Appeal have uniformly recognized that the cause of action established by this statute is equitable in nature. (See, e.g., *Solus Industrial Innovations, LLC v. Superior Court* (2018) 4 Cal.5th 316, 340 [the UCL " 'provides an *equitable* means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices' " (italics added and omitted)]; *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144 ["A UCL action is equitable in nature; damages cannot be recovered. . . . Civil penalties may be assessed in public unfair competition actions, but the law contains no criminal provisions" (citation omitted)].)

In *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 (*Cel-Tech*), our court addressed questions arising from the expansive scope of the language of the UCL in a case in which the plaintiff cell phone

---

Act. (See, e.g., *People ex rel. Mosk v. National Research Co.* (1962) 201 Cal.App.2d 765, 772-773.)

The United States Supreme Court, in discussing the Federal Trade Commission's exercise of its authority to determine whether a trade practice is "unfair" under the Federal Trade Commission Act in *FTC v. Sperry & Hutchinson Co.* (1972) 405 U.S. 233, 244, concluded that "legislative and judicial authorities alike convince us that the Federal Trade Commission does not arrogate excessive power to itself if, in measuring a practice against the elusive, but congressionally mandated standard of fairness, it, *like a court of equity*, considers public values beyond simply those enshrined in the letter or encompassed in the spirit of antitrust laws." (Italics added.)

vendor challenged the business practices of the defendant competitor cell phone company as unfair under the UCL. In that case, the plaintiff contended that the defendant had assertedly taken improper advantage of its privileged position as one of only two cell phone companies licensed to provide cellular service in the Los Angeles area when it engaged in the practice of selling cell phones to its cellular service customers at below cost. In *Cel-Tech*, we noted that our court had not yet defined the term "unfair" as used in the UCL and determined that although two Court of Appeal decisions had attempted such a definition,[9] the suggested definitions in those appellate decisions were "too amorphous and provide too little guidance to courts and businesses." (*Cel-Tech*, at p. 185.)

Thereafter, in devising "a more precise test for determining what is unfair under the unfair competition law", the court in *Cel-Tech* "turn[ed] for guidance to the jurisprudence arising under the 'parallel' section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(a))" (FTC Act), observing that " '[i]n view of the similarity of language and obvious identity of purpose of the two statutes, decisions of the federal court on the subject are more than ordinarily persuasive.' " (*Cel-Tech*, *supra*,

---

[9]    See *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530, which stated that "an 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," and *State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1104, which declared that in determining whether a business practice is unfair " 'the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim.' "

20 Cal.4th at p. 185.)  After describing a number of federal high court decisions considering the types of practices that would be considered "'unfair methods of competition'" between competitors under section 5 of the FTC Act (*Cel-Tech*, at p. 186) — federal decisions that the *Cel-Tech* court emphasized it considered persuasive but not "controlling or determinative" (*id.* at p. 186, fn. 11) — the court in *Cel-Tech* concluded that "to guide courts and the business community adequately and to promote consumer protection, we must require that any finding of unfairness to competitors under [Business and Professions Code] section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition.  We thus adopt the following test:  *When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200 [(the relevant provision of the UCL)], the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition*" (20 Cal.4th at pp. 186-187, italics added).

It is clear from both the language and nature of the test adopted in *Cel-Tech* — that is, whether the challenged business practice "threatens an incipient violation of an antitrust law" or "violates the policy or spirit of one of those laws" — that such a standard is one that may reasonably be applied only by a court. (*Cel-Tech*, *supra*, 20 Cal.4th at p. 187.)  This standard is too indeterminate to be adequately conveyed by jury instructions or applied by a jury.  Indeed, the *Cel-Tech* court's detailed description of the analysis that would have to be undertaken on

remand of that case in determining whether the challenged practice meets the test of unfairness adopted in *Cel-Tech* makes it clear that our opinion in that case recognized that the test was to be applied by the trial court and not a jury. (See *Cel-Tech*, *supra*, 20 Cal.4th at pp. 188-191; cf. *F. T. C. v. Motion Picture Adv. Co.* (1953) 344 U.S. 392, 396 ["The point where a method of competition becomes 'unfair' . . . will often turn on the exigencies of a particular situation, trade practices, or the practical requirements of the business in question"].)

The court in *Cel-Tech* explicitly noted that the case before it involved "an action by a competitor alleging anticompetitive practices" and emphasized that the specific test adopted in that decision was limited to that context and did not apply to "actions by consumers or by competitors alleging other kinds of violations of the unfair competition law." (*Cel-Tech*, *supra*, 20 Cal.4th at p. 187, fn. 12.) Subsequent to the decision in *Cel-Tech*, our court has not addressed the question whether in actions under the UCL brought on behalf of consumers rather than competitors, the term "unfair" in the UCL needs to be similarly defined in a more prescribed standard or test, and, if so, what that test should be. In the years since *Cel-Tech*, a split of authority has developed in the Courts of Appeal with regard to the proper test for determining whether a business practice is unfair under the UCL in consumer cases, with appellate decisions adopting three different tests for determining unfairness in the consumer context. (See, e.g., *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 380, fn. 9 [describing split

of authority].)[10]   The issue of the proper test for defining the term "unfair" as used in the UCL in the consumer context is not

---

[10]   One line of Court of Appeal decisions has held that a balancing test, which the *Cel-Tech* court declined to adopt in the competitor context (see *Cel-Tech*, *supra*, 20 Cal.4th at pp. 184-185), should nonetheless be applied in the consumer context, under which the determination whether a business practice is unfair to consumers " ' "involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer.  In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." ' " (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718; see, e.g., *Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 539; cf. *FTC v. Sperry & Hutchinson Co.*, *supra*, 405 U.S. 233, 244-245, fn. 5 [quoting with approval similar test adopted by FTC in 1964 for determining unfairness under § 5 of the FTC Act].)

A second line of Court of Appeal decisions has adopted what has been termed a "tethering test," requiring that "the public policy which is a predicate to [a consumer unfair competition action under the 'unfair' prong of the UCL] must be 'tethered' to specific constitutional, statutory or regulatory provisions" in a manner similar to which *Cel-Tech* requires a competitor's cause of action to be tethered to the antitrust laws. (*Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 854; see, e.g., *Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 940.)

A third line of Court of Appeal cases has adopted the three-part definition of unfairness applied under section 5 of the FTC Act since 1980, namely that: "(1) The consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." (*Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403; see, e.g., *Rubenstein v. The Gap* (2017) 14 Cal.App.5th 870, 880.) This test has sometimes been termed the "section 5 test."

raised in the present case, and we have no occasion to address it here. Nonetheless, we note that all the tests that have been proposed in the appellate court decisions are ones that, like the test adopted in *Cel-Tech*, can reasonably be applied only by courts, rather than by juries.

Accordingly, both (1) the fact that the cause of action under the UCL originated solely as an action to enjoin an unfair or misleading business practice — an equitable action triable only by a court and not a jury — and (2) the fact that the broad and general standard of unfair competition that was incorporated into the statute contemplated that the standard would be applied by a court exercising its traditional, flexible equitable authority rather than by a jury, support the conclusion that the Legislature, in enacting the UCL, intended that a cause of action under the UCL would be tried by the court and not a jury, even when the government seeks civil penalties as well as injunctive relief.

We note that the nature of the principal issue presented in a great many UCL actions additionally supports the conclusion that such causes of action were intended to be decided by the court rather than a jury. A cursory review of the numerous UCL actions that have been brought in recent years (see Stern, Cal. Practice Guide: Bus. & Prof. Code § 17200 Practice (The Rutter Group 2019) § 3:131, pp. 3-39 to 3-44 [describing 41 recent UCL cases]) reveals that such cases often concern a nuanced and qualitative determination regarding whether a business practice should properly be considered unfair or deceptive within the meaning of the UCL. (See, e.g., *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1376-1382 [considering whether failing to sell temperature-adjusted

motor fuel or to disclose the effect of temperature increases on the volume of fuel sold could constitute an unfair or fraudulent business practice]; *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 907-908 [considering whether bank's practice of "dual tracking" — agreeing to a loan modification while continuing to pursue foreclosure — could constitute an unfair or fraudulent business practice].) This type of qualitative determination — often requiring the consideration of a variety of factors or circumstances identified in prior cases in California or other jurisdictions or in administrative guidelines developed by the Federal Trade Commission or other consumer protection administrative agencies — is the type of decision that has traditionally been viewed as the province of courts rather than juries.

Moreover, we have emphasized that " 'the overarching legislative concern [in enacting the UCL is] to provide a *streamlined* procedure for the prevention of ongoing or threatened acts of unfair competition' " (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 173-174), an objective that is inconsistent with the unavoidable delays and increased costs inherent in a jury, as compared to a court, trial. Furthermore, having a court, rather than a jury, decide the question whether a business practice is properly considered unfair or deceptive for purposes of the UCL has the additional significant benefit — for both defendants and plaintiffs — of facilitating appellate review of that determination, because a trial court, unlike a jury, is required to provide, upon request of any party, "a statement of decision explaining the factual and legal basis for its decision." (Code Civ. Proc., § 632.) And having appellate courts in the position in which they can adequately

review trial courts' evaluations of the validity of business practices under the UCL, in turn, promotes the creation of a cumulative body of precedent that improves the consistency of future determinations under the UCL and provides needed guidance to companies in the formulation of their business practices.

In sum, for all of the foregoing reasons, we believe that it is clear that the Legislature intended that a cause of action under the UCL — including an action brought by the government that seeks both injunctive relief and civil penalties — is to be tried by the court rather than by a jury.

### B. The FAL

The FAL (Bus. & Prof. Code, § 17500 et seq.) has been accurately described as "the major California legislation designed to protect consumers from false or deceptive advertising." (*People v. Superior Court (Olson)* (1979) 96 Cal.App.3d 181, 190.) The procedures set forth in the FAL and UCL are in many respects parallel to one another, and the UCL specifically provides that any practice that violates the FAL is also prohibited by the UCL. (See Bus. & Prof. Code, § 17200.)

The original version of the FAL creating a civil cause of action was enacted in 1941. (Stats. 1941, ch. 63, § 1, pp. 727-729 [enacting Bus. & Prof. Code, §§ 17500-17535].)[11] The

---

[11] The FAL traces its origin to the 1915 version of former Penal Code section 654a (Stats. 1915, ch. 634, § 1, pp. 1252-1253), which, in turn, was based upon a model false advertising statute that was first proposed in 1911 in *Printer's Ink* magazine, an advertising journal. (See Note, *The Regulation of*

statute broadly prohibited false or misleading advertising, declaring that it is unlawful for any person or business to make or distribute any statement to induce the public to enter into a transaction "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." (Bus. & Prof. Code, § 17500.) Like the civil cause of action authorized by the original version of the UCL, the FAL, as originally enacted, explicitly authorized only injunctive relief (Bus. & Prof. Code, former § 17535), permitting civil actions for injunction under the act to be prosecuted by the Attorney General or any district attorney on behalf of the People, and also "by any [entity or] person acting for the interests of itself, its members or the general public." (*Ibid.*) Because the civil action established by the 1941 legislation authorized only injunctive relief, it is clear that, as originally enacted, a civil action under the FAL, like that under the UCL as originally enacted, was equitable in nature and was intended

*Advertising* (1956) 56 Colum. L.Rev. 1018, 1058; Note, *Enforcing California's False Advertising Law: A Guide to Adjudication* (1974) 25 Hastings L.J. 1105, 1106.) The 1911 model statute proposed to make it a misdemeanor to publish an advertisement containing " 'any assertion, representation or statement of fact which is untrue, deceptive or misleading' " and was quite stringent, omitting any requirement that the advertiser be shown to have intended to deceive or to know the improper character of the advertisement. (Note, *The Regulation of Advertising*, *supra*, 56 Colum. L.Rev. at pp. 1058-1059 & fn. 245.) In adopting the statute in California in 1915, however, the Legislature added a scienter requirement, requiring a showing that the advertiser knew or, in the exercise of reasonable care, should have known of the false, deceptive or misleading character of the advertisement. (Stats. 1915, ch. 634, § 1.)

to be tried by a court and not a jury. Again, Nationwide does not argue otherwise.

In 1965, the Legislature added Business and Professions Code section 17536 to the FAL, authorizing the Attorney General or a district attorney, but not a private party, to seek a civil penalty not to exceed $2,500 for each violation of the FAL. (Stats. 1965, ch. 827, § 1, pp. 2419-2420.) The enactment of section 17536 as part of the FAL in 1965 predated the enactment in 1972 of the comparable provision of the UCL, discussed above, authorizing the Attorney General or a district attorney to seek civil penalties as well as injunctive relief in an action under the UCL. (See, *ante*, pp. 11-12.) As with the comparable provision of the UCL, the legislative history of the 1965 enactment of section 17536 indicates that the legislation was introduced at the request of the Attorney General to provide an additional remedy in actions to enjoin fraudulent sales schemes. (See Assemblyman George E. Danielson, letter to Gov. Edmund G. Brown, June 14, 1965 [urging approval of 1965 bill introduced by Danielson].) Nothing in the legislative history of the 1965 enactment indicates any legislative intent to change the nature of a civil action under the FAL from an equitable action that is tried to the court to one that is tried by a jury. As under the UCL, actions under the FAL that were filed by private parties, in which injunctive relief was the prescribed remedy, continued to be tried by the court, not a jury.

In *People v. Superior Court (Jayhill Corp.)* (1973) 9 Cal.3d 283 (*Jayhill*), this court addressed a number of issues arising in a civil action filed by the Attorney General under the FAL in which the Attorney General sought injunctive relief, restitution and civil penalties for alleged false and misleading advertising

engaged in by door-to-door encyclopedia salespersons. The trial court had permitted the action to go forward with respect to injunctive relief but had struck all other forms of relief.

On appeal, the court in *Jayhill* first addressed the question of the availability of restitution in an FAL action under Business and Professions Code section 17535. At the time the complaint in *Jayhill* was filed, section 17535 provided simply "that false or misleading advertising 'may be enjoined' in an action by the Attorney General, but was silent as to the power of the trial court to order restitution in such a proceeding." (*Jayhill*, *supra*, 9 Cal.3d at p. 286.) Relying on the general principle that "[i]n the absence of such a restriction *a court of equity* may exercise the full range of its inherent powers in order to accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved," the *Jayhill* court held that "in an action by the Attorney General under section 17535 a trial court has the inherent power to order, as a form of ancillary relief, that the defendants make or offer to make restitution to the customers found to have been defrauded." (*Ibid*, first italics added.)[12] Thus, the court in *Jayhill* clearly recognized that a civil action under the FAL is an equitable action triable to the court.

---

[12] After the trial court ruling but prior to our decision in *Jayhill*, the Legislature had explicitly amended Business and Professions Code section 17535 to authorize the court to order restitution as well as injunctive relief. (Stats. 1972, ch. 244, § 1, p. 494.) In *Jayhill,* the court found that in light of its legislative history, the 1972 amendment was not intended "to create a new power in the trial court but simply to clarify existing law on the point." (*Jayhill*, *supra*, 9 Cal.3d at p. 287, fn. 1.)

In *Jayhill, supra,* 9 Cal.3d 283, this court also addressed a separate issue concerning the application of Business and Professions Code section 17536, the provision of the FAL authorizing the trial court to impose civil penalties in a civil action under the FAL. We found that the trial court in that case had erred in determining that " 'each claim for penalty is a separate cause of action' " which must be separately stated, concluding instead that "*[t]he Attorney General has only one cause of action against a particular defendant for violating section 17500; for this he seeks several forms of relief, including the civil penalty of $2,500 set forth in section 17536.* Since multiple victims are involved he prays for a penalty for each violation, but this does not elevate each violation to a separate cause of action. . . . We hold that the Attorney General has only one cause of action against a defendant for violating section 17500, but that the amount of civil penalties which may be imposed under section 17536 is dependent upon the number of 'violations' committed by a defendant." (9 Cal.3d at p. 288, italics added.) Because, as we have seen, the court in *Jayhill* had already explained that the cause of action for violating section 17500 is an equitable action (*Jayhill*, at p. 286), the clear implication of the decision in *Jayhill* is that even when the Attorney General or a district attorney seeks civil penalties as well as injunctive relief in such an action, the action under the FAL remains an equitable action, and, as such, is to be tried by the court, rather than by a jury.

In 1992, Business and Professions Code section 17536 was amended to provide that "[i]n assessing the amount of the civil penalty, *the court* shall consider any one or more of the relevant circumstances presented by any of the parties to the case,

including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." (Stats. 1992, ch. 430, § 5, p. 1709, italics added.) This wording directly tracks the language that was added to section 17206 of the UCL in the same 1992 legislation. (See, *ante*, p. 13.) Again, this terminology makes it clear that the Legislature intended that the amount of civil penalties under the FAL is to be determined by the court, not by a jury.

As with respect to the UCL, past decisions of both this court and the Courts of Appeal have consistently described the civil cause of action authorized by the FAL as an equitable action that is to be tried by the court rather than a jury, including when the action is one brought by a government attorney and seeks civil penalties as well as injunctive relief. (See, e.g., *Jayhill, supra*, 9 Cal.3d at p. 286; *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442, 452 ["the basic equitable principles underlying [Business and Professions Code] section 17535 arm the trial court with broad discretionary power . . . '. . . to accomplish complete justice between the parties' "]; *People v. Overstock.com, Inc.* (2017) 12 Cal.App.5th 1064, 1091 (*Overstock.com*) [the " ' "equitable" . . . "remedial power granted under [the UCL and FAL] is extraordinarily broad" ' "].)

Like the choice of the term "unfair" in the UCL, the governing substantive standard of the FAL — prohibiting advertising that is "untrue or *misleading*" (Bus. & Prof. Code, § 17500, italics added) — is set forth in broad and open-ended language that is intended to permit a court of equity to reach

any novel or creative scheme of false or misleading advertising that a deceptive business may devise. (See, e.g., *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320; *Overstock.com, supra*, 12 Cal.App.5th 1064, 1091 [" ' "Probably because false advertising and unfair business practices can take many forms, the Legislature has given the courts the power to fashion remedies to prevent their 'use or employment' in whatever context they may occur" ' "].) As this court explained in *Kasky v. Nike* (2002) 27 Cal.4th 939, the FAL prohibits " 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.' [Citation.] Thus, to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, 'it is necessary only to show that "members of the public are likely to be deceived." ' " (*Kasky*, at p. 951, quoting *Leoni v. State Bar* (1985) 39 Cal.3d 609, 626 and *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211 (*Com. on Children's Television*).)[13]

It is true that the broad reach and scope of the FAL's untrue or misleading standard is often framed in language (whether members of the public are likely to be deceived) that is not, on its face, beyond the ken of a jury. As employed in the FAL (as well as in the UCL), however, a determination that advertising poses a sufficient risk or tendency to deceive or

---

[13]    As noted above (*ante*, p. 11), the UCL contains an overlapping prohibition of impermissible advertising, barring, in addition to "any unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising." (Bus. & Prof. Code, § 17200.)

confuse the public may potentially result in an injunctive order prohibiting what may be a common and widely utilized advertising, labeling, or promotional practice. (See, e.g., *Chern v. Bank of America* (1976) 15 Cal.3d 866, 875-876 [challenge to common bank practice of calculating interest rate advertised as "per annum" on the basis of a 360-day year]; *Com. on Children's Television, supra*, 35 Cal.3d 197, 205-215, 222-223 [challenge to children's television advertising representing that breakfast foods with high sugar content are " 'healthful and nutritious,' " and labeling such foods " ' "cereals" ' " rather than " 'candy breakfasts' "].) In the FAL and UCL settings, this standard — whether members of the public are likely to be deceived — has been understood to call for the exercise of the type of equitable discretion and judgment traditionally employed by a court of equity. As in the case of the UCL, the crucial issue in cases under the FAL does not typically involve the type of ordinary factfinding assigned to a jury, but rather calls for an equitable judgment to determine whether an often undisputed advertising or promotional practice presents a sufficient tendency to deceive or confuse the public so as to support invocation of the FAL's remedies. As the breadth of the cases arising under the FAL attests, this determination calls for consideration of a wide variety of factors that prior cases and past administrative experience have shown may render an affirmative statement (or a failure to disclose) in a product label, packaging, or in other advertising or promotional practices misleading in a particular context.[14] And, again as in the UCL context (see *ante,* p. 23),

---

[14] For a general discussion of the numerous and complex factors and considerations that may affect the determination

given the capacity of the FAL's standard to be applied expansively to encompass all of the novel ways in which advertising or promotional material may be misleading, it is important that trial courts are required to set forth their reasoning for a determination that the FAL has been violated so that a body of precedent can evolve to inform businesses of advertising practices they must avoid.

In *Brady v. Bayer Corp.* (2018) 26 Cal.App.5th 1156, for example, the Court of Appeal determined that the One A Day label on a bottle of gummy vitamins that required, in "miniscule" instructions on the back of the label (*id.* at p. 1159), that *two* gummies be taken daily to provide the recommended daily vitamin dosage was sufficiently potentially misleading to support a cause of action for violation of the FAL. The *Brady* court pointed out that despite the well understood traditional meaning of the One A Day brand, consumers who take one gummy a day "end up receiving only half the daily vitamin coverage they think they are getting." (*Brady* at p. 1160.) In the course of its opinion, the *Brady* court discussed at some length a number of factors that past decisions had considered and balanced in determining whether a product label could be found sufficiently misleading to violate the FAL, including "common sense," the factual context in which literally true or literally false statements are made, the degree to which back-of-the-label qualifiers ameliorate any tendency to mislead, and the tendency of particular brand names to mislead. (*Brady*, at

---

whether advertising should properly be viewed as deceptive or misleading, see *Developments in the Law — Deceptive Advertising* (1967) 80 Harv. L.Rev. 1005, 1038-1063.

pp. 1165-1174.)  Considering these factors as a whole, the *Brady* court found that the One A Day label had a sufficient " 'capacity, likelihood or tendency to deceive or confuse the public' " to support a cause of action under the FAL.  (*Brady*, at p. 1173.)

As a further example, in *Day v. AT&T Corp.* (1998) 63 Cal.App.4th 325, the Court of Appeal determined that although the defendant phone company's policy of rounding up charges for phone calls longer than a minute to the next full minute was permissible under the "filed rate" doctrine, the failure of the packaging of defendant's prepaid phone cards to disclose this rounding-up practice was sufficiently misleading to violate the FAL.  In reaching this conclusion, the *Day* court considered but distinguished two earlier out-of-state decisions that had rejected a claim by ordinary phone subscribers that a telephone company's failure to disclose the rounding-up practice was misleading.  The court relied on the fact that unlike ordinary phone bills that disclosed to consumers that all phone calls were charged for full minutes, "[t]he phone cards in question, whose outer packagings do not reveal the practice of rounding up, are *prepaid*.  A consumer cannot read any materials provided by the carrier with the card *before* buying the card, which will advise him or her of the practice.  Based on the advertising a consumer will not know that whole minutes are being credited for each fraction of a minute until the card has been used."  (*Day*, at p. 334.)  Under these circumstances, the *Day* court concluded "that the practices alleged here were likely to mislead, confuse or deceive members of the public."  (*Ibid.*)

And in *Overstock.com, supra*, 12 Cal.App.5th 1064, the Court of Appeal upheld a trial court finding that the defendant online bargain retailer had violated the FAL through its online

advertising practices. The defendant had used a number of different methods to indicate the purported bargain nature of its prices. At first, its advertisements displayed a "list price" that was shown stricken through, along with the retailer's own lower price and the difference that the consumer would assertedly save. Later, the advertisements changed "list price" to "compare at," and thereafter, to "compare." The evidence at trial showed, however, that (1) the defendant failed to have a reliable procedure in place to verify that the comparator prices were realistic and (2) that the prices being compared frequently were not for the same or similar item. In affirming the trial court's finding that the challenged advertising was false or misleading within the meaning of the FAL, the *Overstock.com* court relied in part on the Federal Trade Commission (FTC) Guides Against Deceptive Pricing (16 C.F.R. § 233 (2020)). (*Overstock.com, supra*, 12 Cal.App.5th at p. 1081.) That FTC guide sets forth in considerable detail the numerous ways in which advertised pricing practices may be misleading or deceptive. (See 16 C.F.R. §§ 233.1-233.5 (2020).) Specifically with respect to retail value comparisons, the guide provides that the advertiser "should be reasonably certain that the higher price he advertises does not appreciably exceed the price at which substantial sales of the article are being made in the area — that is, a sufficient number of sales so that a consumer would consider a reduction from the price to represent a genuine bargain or saving" and also that the compared merchandise is "of essentially similar quality and obtainable in the area." (16 C.F.R. § 233.2(a), (c) (2020).)

The Court of Appeal decision in *Overstock.com* illustrates that, as with the determination whether a business practice is unfair within the meaning of the UCL, the complexities and

nuances that are often involved in the determination whether an advertisement should properly be considered untrue or misleading for purposes of the FAL are often ameliorated by judicial reference to the relevant guidelines developed by the FTC regarding deceptive advertising. (See generally Stern, Cal. Practice Guide: Bus. & Prof. Code § 17200 Practice, *supra*, §§ 4:46-4:80.4, pp. 4-14 to 4-32.) The great variety and complexity of contexts in which the potentially misleading nature of advertising may arise and must be evaluated can be gleaned from a simple listing of the numerous guidelines, in addition to the Guides Against Deceptive Pricing relied upon in *Overstock*, that the FTC has published relating to deceptive advertising. (See Guides Against Bait Advertising [16 C.F.R. §§ 238.0-238.4 (2020)]; Guides for the Advertising of Warranties and Guarantees [16 C.F.R. §§ 239.1-239.5 (2020)]; Guides for Advertising Allowances and Other Merchandising Payments and Services [16 C.F.R. §§ 240.1-240.15 (2020)]; Guide Concerning Use of the Word "Free" and Similar Representations [16 C.F.R. § 251.1(a)-(i) (2020)]; Guides for Private Vocational and Distance Education Schools [16 C.F.R. §§ 254.0-254.7 (2020)]; Guides Concerning Use of Endorsements and Testimonials in Advertising [16 C.F.R.§§ 255.0-255.5 (2020)]; Guide Concerning Fuel Economy Advertising for New Automobiles [16 C.F.R. §§ 259.1-259.4 (2020)]; Guides for the Use of Environmental Marketing Claims [16 C.F.R. §§ 260.1-260.17 (2020)].)

And a brief look at just one of these FTC guidelines — the Guides Concerning Use of Endorsements and Testimonials in Advertising — provides a good indication of the type of equitable consideration and evaluation of a substantial variety of factors

that often goes into the determination whether advertising is properly considered untrue or misleading for purposes of the FAL. The guide on endorsements declares, for example, that "[e]ndorsements must reflect the honest opinions, findings, beliefs, or experience of the endorser," and that "[a]n advertiser may use an endorsement of an expert or celebrity only so long as it has good reason to believe that the endorser continues to subscribe to the views presented. An advertiser may satisfy this obligation by securing the endorser's views at reasonable intervals where reasonableness will be determined by such factors as new information on the performance or effectiveness of the product, a material alteration in the product, changes in the performance of competitors' products, and the advertiser's contract commitments." (16 C.F.R. § 255.1 (a), (b) (2020).) This FTC guide also distinguishes between advertising that uses "consumer endorsements" and advertising that uses "expert endorsements." (*Id.,* §§ 255.2, 255.3 (2020).) With respect to consumer endorsements, the guide provides in part: "An advertisement employing endorsements by one or more consumers about the performance of an advertised product or service will be interpreted as representing that the product or service is effective for the purpose depicted in the advertisement. Therefore, the advertiser must possess and rely upon adequate substantiation, including, when appropriate, competent and reliable scientific evidence, to support such claims made through endorsements in the same manner the advertiser would be required to do if it had made the representation directly, *i.e.*, without using endorsements." (*Id.*, § 255.2(a) (2020).) With respect to expert endorsements, the guide requires that "the endorser's qualifications must in fact

give the endorser the expertise that he or she is represented as possessing with respect to the endorsement," and that "the endorsement must be supported by an actual exercise of that expertise in evaluating product features or characteristics with respect to which he or she is expert and which are relevant to an ordinary consumer's use of or experience with the product and are available to the ordinary consumer. This evaluation must have included an examination or testing of the product at least as extensive as someone with the same degree of expertise would normally need to conduct in order to support the conclusions presented in the endorsement." (*Id.*, § 255.3(a), (b) (2020).) Further, the guide provides with respect to all endorsers that "[w]hen there exists a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement (*i.e.*, the connection is not reasonably expected by the audience), such connection must be fully disclosed." (*Id.*, § 255.5 (2020).) Finally, the guide discusses numerous hypothetical examples that further explain the guide's provisions. (See *id.*, §§ 255.1-255.5 (2020).)

Thus, as past FAL decisions and the numerous FTC guidelines indicate, the determination whether an advertising or promotional practice should properly be found untrue or misleading within the meaning of the FAL depends upon the exercise of the type of equitable discretion and judgment typically employed by a court of equity. Federal cases examining whether an advertising practice is sufficiently deceptive to violate analogous federal consumer protection statutes also support this conclusion. (See, e.g., *FTC v. Colgate-Palmolive Co.* (1965) 380 U.S. 374, 385-392 [discussing competing considerations involved in determining whether an

undisclosed televised mock-up of a product demonstration could properly be found to constitute deceptive advertising even if the underlying product claim was true]; *FTC v. Mary Carter Paint Co.* (1965) 382 U.S. 46, 47-48 [upholding FTC finding that advertisement offering a free can of paint if the consumer bought a can of the same paint at the advertised price was deceptive when the manufacturer never sold single cans of paint, even if the advertised price was a fair price for a single can of comparable paint]; *FTC v. Direct Mktg. Concepts, Inc* (D.Mass. 2008) 569 F.Supp.2d 285, 298-299 [discussing numerous factors to be considered in determining whether an advertiser had sufficient "substantiation for the representation prior to making it in an advertisement" so as to render the advertisement nondeceptive].)[15]

---

[15] At oral argument, counsel for Nationwide suggested that in federal court juries often decide such questions in actions under the FTC Act in which civil penalties are sought. Under the FTC Act, however, civil penalties may be sought only for a defendant's violation of a prior cease and desist order (15 U.S.C. §§ 45(l), 45(m)(1)(B)) or for a defendant's knowing violation of a specific trade regulation rule (45 U.S.C. § 45(m)(1)(A)). Although federal courts have held that there is a right to a jury trial in such actions, the jury in such actions does not determine whether the practice is unfair or deceptive within the meaning of the FTC Act, but rather determines only whether the defendant violated the existing cease and desist order or the specific trade regulation rule. (See, e.g., *United States v. J.B. Williams Co.* (2d Cir. 1974) 498 F.2d 414, 421-430; *U.S. v. Dish Network, LLC* (C.D.Ill. 2010) 754 F.Supp.2d 1002, 1003-1004. See also 45 U.S.C. § 45(m)(2) [providing that when the cease and desist order was not issued against the particular defendant from whom civil penalties are sought, upon request *"the court shall . . . review the determination of law made by the*

Furthermore, past FAL decisions also make clear the propriety and importance of a court's exercise of its equitable authority not only in determining whether an advertisement is untrue or misleading, but also in determining (1) the number of violations for which a defendant may properly be held responsible (see, e.g., *Jayhill, supra,* 9 Cal.3d 283, 288-289; *Overstock.com, supra,* 12 Cal.App.5th 1064, 1087-1088; *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1249-1255; *People ex rel. Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 127-130 (*Beaumont Investment*); *People v. Toomey* (1985) 157 Cal.App.3d 1, 22-23; *People v. Superior Court (Olson), supra,* 96 Cal.App.3d 181, 197-198), and (2) the reasonable amount of civil penalties to be imposed for each violation.  (See, e.g., *Overstock.com, supra,* 12 Cal.App.5th at pp. 1087-1091; *Beaumont Investment, supra,* 111 Cal.App.4th at pp. 130-131; *People v. First Federal Credit Corp.* (2002) 104 Cal.App.4th 721, 733-734.)

In sum, in light of the language and legislative history of the FAL and the relevant judicial precedent, we believe it is clear that, as with the UCL, the Legislature intended that the civil cause of action embodied in the FAL would be tried by a court of equity rather than by a jury in all FAL actions, including instances in which the Attorney General or another governmental entity seeks civil penalties for a violation of the FAL as well as injunctive relief.

---

Commission . . . that the act or practice which was the subject of such proceeding constituted an unfair or deceptive act or practice in violation of subsection (a)" (italics added)].)

## IV. UNDER THE CALIFORNIA CONSTITUTION, IS THERE A *CONSTITUTIONAL* RIGHT TO JURY TRIAL IN A UCL OR FAL ACTION WHEN THE PEOPLE SEEK BOTH INJUNCTIVE RELIEF AND CIVIL PENALTIES?

As already noted, in our recent decision in *Shaw*, we explained that "even when the language and legislative history of a statute indicate that the Legislature intended that a cause of action established by the statute is to be tried by the court rather than by a jury, if the California constitutional jury trial provision itself guarantees a right to a jury trial in such a cause of action, the Constitution prevails and a jury trial cannot be denied." (*Shaw*, *supra*, 2 Cal.5th at p. 994.) Thus, we turn to the question whether, notwithstanding the Legislature's intent that such actions be tried by the court rather than a jury, the jury trial provision of the California Constitution itself guarantees a right to jury trial in an action brought by the People under the UCL or FAL that seeks both injunctive relief and civil penalties.

### A. General California Constitutional Jury Trial Principles

Article I, section 16 of the California Constitution — the jury trial provision — states in relevant part that "[t]rial by jury is an inviolate right and shall be secured to all. . . ." From the outset of our state's history, our courts have explained that this provision was intended *to preserve* the right to a civil jury as it existed at common law in 1850 when the jury trial provision was first incorporated into the California Constitution. (See, e.g., *Cassidy v. Sullivan* (1883) 64 Cal. 266, 266; *Koppikus v. State Capitol Comm'rs* (1860) 16 Cal. 248, 253-255.) As this court observed in *People v. One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283 (*One 1941 Chevrolet Coupe*): " 'The right to trial by jury

guaranteed by the Constitution is the right as it existed at common law at the time the Constitution was adopted. . . . It is the right to trial by jury as it existed at common law which is preserved; and what that right is, is a purely historical question, a fact which is to be ascertained like any other social, political or legal fact. The right is the historical right enjoyed at the time it was guaranteed by the Constitution.' " (*Id.* at pp. 286-287.) "Our state Constitution essentially *preserves* the right to a jury in those actions in which there was a right to a jury trial at common law at the time the Constitution was first adopted." (*Crouchman v. Superior Court* (1988) 45 Cal.3d 1167, 1175 (*Crouchman*).)

Pursuant to this historical approach, as a general matter the California Constitution affords a right to a jury trial in common law actions at law that were triable by a jury in 1850, but not in suits in equity that were not triable by a jury in 1850. (*C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 8-9 (*C & K Engineering*).) In applying this test, our cases have explained that the *form* or *title* of a statutory cause of action is not controlling and that if the *substance* of the cause of action is one that would have been triable by a jury at common law, there is a right to a jury trial even if the statute's designation might suggest that it is an equitable proceeding. (See, e.g., *One 1941 Chevrolet Coupe, supra*, 37 Cal.2d at p. 299.) " 'In determining whether the action was one triable by a jury at common law, the court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case — the gist of the action. A jury trial must be granted where the gist of the action is legal, where the action is in reality cognizable at law.' " (*Ibid.*) In the *One 1941 Chevrolet*

*Coupe* decision, for example, the court held that the gist of the action at issue in that case — a civil lawsuit by the government seeking forfeiture of an automobile that was allegedly used to illegally transport a prohibited drug — was legal because at common law a similar cause of action for forfeiture of otherwise lawful property that was allegedly used for unlawful purposes was triable by a jury in a court of law. (*Id.* at pp. 297-300.) The court ruled that the fact that the statutory provision authorizing the cause of action designated the forfeiture action as a " 'special proceeding' " did not change the legal nature of the action. (*Id.* at p. 299.)

The court in *One 1941 Chevrolet Coupe, supra*, 37 Cal.2d 283, further explained that the fact that the statute under which the forfeiture proceeding in that case was brought was enacted after the adoption of the California Constitution did not in itself bring the statutory cause of action outside the guarantee of the constitutional jury trial provision. The court observed in this regard: " 'The constitutional right of trial by jury is not to be narrowly construed. It is not limited strictly to those cases in which it existed before the adoption of the Constitution but is extended to cases of like nature as may afterwards arise. It embraces cases of the same class thereafter arising." (*One 1941 Chevrolet Coupe*, at p. 300.) In explaining why the lawsuit at issue was of " 'like nature' " or " 'the same class' " as the common law action at law, the court stated: " 'At common law, prior to the adoption of the Constitution, a party against whom the forfeiture of property used in violation of law (then a carriage, wagon, horse or mule, now usually an automobile), was sought to be enforced was entitled to a trial by jury. Consequently such right exists now.' " (*Ibid.*; see also *Franchise Tax Bd. v. Superior*

*Court* (2011) 51 Cal.4th 1006, 1012 ["We look to whether a claim arising under a modern statute is 'of like nature' or 'of the same class' as a common law right of action"].)

In a case like *One 1941 Chevrolet Coupe* that involves a single cause of action that at common law in 1850 was triable only by a jury, or conversely a case involving a single cause of action that at common law was triable only by the court (see, e.g., *People v. Englebrecht* (2001) 88 Cal.App.4th 1236, 1245 [action for injunctive relief to abate a nuisance]), the determination whether the gist of the action in question is legal or equitable is relatively straightforward. When a case involves multiple causes of action or multiple issues, some of which are legal in nature and would have been triable by a jury at common law and some of which are equitable in nature and would have been triable by the court at common law, the analysis is somewhat more complex.

## B. Cases Involving Severable Legal and Equitable Issues

When the legal and equitable causes of action or issues presented in a case are severable, past California decisions establish that a party retains the right to a jury trial of the severable legal issues and a court trial of the severable equitable issues. (See, e.g., *Connell v. Bowes* (1942) 19 Cal.2d 870, 871 ["It is now established in this state . . . that if a complaint states two complete rights of action, one legal and one equitable, a jury trial may be obtained upon the issues raised by the legal cause"]; see generally 7 Witkin, *supra*, Trial, § 86, p. 113 ["Where the action is of a hybrid character, raising legal and equitable issues, a party is entitled to a jury trial of the severable legal issues"].)

At the same time, California decisions have also repeatedly held that when severable legal and equitable causes of action or issues are present in a single proceeding, the trial court generally has authority to determine in what order the matters should be heard, and if the equitable issue is tried by the court first and if the court's resolution of that issue determines a matter that would otherwise be resolved by a jury with regard to the legal claim or issue, the court's resolution of the matter will generally be binding and may leave nothing for a jury to resolve. (See, e.g., *Raedeke v. Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671 (*Raedeke*) ["It is well established that, in a case involving both legal and equitable issues, the trial court may proceed to try the equitable issues first, without a jury . . . , and that if the court's determination of those issues is also dispositive of the legal issues, nothing further remains to be tried by a jury"].) And although a trial court retains discretion regarding the order in which the issues should be tried, the governing California cases express a preference that the equitable issues be tried first. (See, e.g., *Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 355 [citing cases].) This general "equity first preference" is a long standing feature of California law and has always been viewed as fully compatible with the right to jury trial embodied in the California Constitution. (See, e.g., *Raedeke, supra,* 10 Cal.3d at pp. 670-671;[16] *Connell v. Bowes, supra,* 19 Cal.2d

---

[16]    In *Raedeke* itself, the court, after confirming the existence and validity of the "equity first preference," held that a plaintiff who brings an action presenting both legal and equitable issues can avoid the potential loss of a jury trial on common issues by electing to forgo the equitable claim and thus removing the

870, 872; *Thomson v. Thomson* (1936) 7 Cal.2d 671, 682-683; *Angus v. Craven* (1901) 132 Cal. 691, 699 (conc. opn. of Henshaw, J.); *Swasey v. Adair* (1891) 88 Cal. 179, 180; *Fish v. Benson* (1886) 71 Cal. 428, 433-435; *Lestrade v. Barth* (1862) 19 Cal. 660, 671-672.)[17]

## C. Cases Involving Nonseverable Legal and Equitable Issues

Unlike proceedings in which multiple legal and equitable causes or issues are severable, when a cause of action involves

---

equitable issues from the case. (See *Raedeke, supra*, 10 Cal.3d at pp. 671-672.)

[17] Contrary to the implication of the Court of Appeal decision below (see *Nationwide Biweekly, supra*, 24 Cal.App.5th at p. 456), this court's recent decision in *Shaw, supra*, 2 Cal.5th 983 did not purport to abrogate or change this state's well-established "equity first preference" doctrine. In *Shaw*, we interpreted one provision of the statute before the court — Health and Safety Code section 1278.5, subdivision (m), which provided that nothing in the new legislation "abrogate[s] or limit[s] any other theory of liability or remedy otherwise available at law" — as preserving in full a plaintiff's complementary cause of action under *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, including the plaintiff's right to obtain a jury resolution of the *Tameny* claim. (*Shaw, supra*, 2 Cal.5th at p. 1006.) *Shaw* did not purport to overrule or disapprove the numerous California decisions cited above that have applied the "equity first preference" doctrine for more than a century.

Because in this case the equitable and legal aspects of the UCL and FAL actions are nonseverable and because Nationwide has not questioned the continued vitality of the "equity first preference" doctrine, we have no occasion to consider whether there is any reason to reevaluate this doctrine or to determine its proper application in a particular context.

legal and equitable aspects that are not severable California decisions have relied upon "the gist of the action" standard in determining whether the action should be considered legal or equitable for purposes of the constitutional jury trial issue. (See, e.g., *C & K Engineering, supra*, 23 Cal.3d 1, 9-11 [in action seeking damages for breach of contract ("in form an action at law") but relying solely on "the equitable doctrine of promissory estoppel," court concluded "[t]he 'gist' of such an action is equitable"]; *Central Laborers' Pension Fund v. McAfee, Inc.* (2017) 17 Cal.App.5th 292, 344-350 [in action by shareholders seeking money damages for breach of corporate directors' and officers' breach of fiduciary duty, court concluded that the gist of the action was equitable]; *Interactive Multimedia Artists, Inc. v. Superior Court* (1998) 62 Cal.App.4th 1546, 1552-1556 [in action seeking money damages for breach of a trustee's fiduciary duty, court held that the gist of the action was equitable when, under the applicable Delaware law, the determination of whether a breach occurred turned on a multifactor " 'entire fairness test' " that required the application of equitable principles in "weighing various considerations in order to reach a just result"]; *Martin v. County of Los Angeles* (1996) 51 Cal.App.4th 688, 695-697 [although a tort defendant's claim for "equitable indemnity" seeking recovery of money damages for the proportional fault of a cotortfeasor involved application of equitable principles, court concluded the gist of the claim was legal because ascertaining the relative fault of cotortfeasors for equitable indemnity "involves determinations of rights and liabilities traditionally arising in common law suits for negligence"].) In our decision in *C & K Engineering*, we noted that "[a]lthough we have said that 'the legal or equitable nature

of a cause of action ordinarily is determined by the mode of relief to be afforded . . . ,' the prayer for relief in a particular case is not conclusive" and " '[t]he fact that damages is one of a full range of possible remedies does not guarantee . . . the right to a jury.' " (*C&K Engineering*, at p. 9, citations omitted.)

Two Court of Appeal decisions that have grappled with the proper characterization of an action as legal or equitable involved statutory causes of action, like those at issue in the present case, in which both equitable and legal relief may be awarded.

In the first case, *Southern Pac. Transportation Co. v. Superior Court* (1976) 58 Cal.App.3d 433 (*Southern Pac. Transportation*), the plaintiffs, who claimed that they had made improvements to real property in the good faith belief that they were the owners of the property, brought the underlying action against the true owner of the property seeking damages as good faith improvers of the property. The action was brought pursuant to a recently enacted "good faith improver" statutory scheme (Code Civ. Proc., §§ 871.1-871.7) that authorized a good faith improver of real property to bring an independent civil cause of action for relief. (*Id.*, § 871.3.) The legislation provided that in such an action the court, under appropriate circumstances, "may . . . effect such adjustment of the rights, equities, and interests of the good faith improver, the owner of the land, and other interested parties . . . as is consistent with substantial justice to the parties under the circumstances of the particular case." (*Id.*, § 871.5.)

The question before the Court of Appeal in *Southern Pac. Transportation* was whether the plaintiffs had a right to a jury trial in their action against the owner. The plaintiffs claimed

that because their complaint sought only money damages from the landowner, the action was one at law in which they had a right to a jury trial. The Court of Appeal rejected the plaintiffs' contention. After noting that the right to a jury trial under the California Constitution is the right "existing at common law at the time the Constitution was adopted" (*Southern Pac. Transportation, supra,* 58 Cal.App.2d at p. 436), the court explained: "Because the provisions of [Code of Civil Procedure] sections 871.1-871.7 have no counterpart in English law, classification of the action as either legal or equitable depends upon characterization of the nature of the relief sought. Although [the plaintiffs] assert that they seek damages only, by bringing an action under section 871.3, they have invited the court to 'effect such an adjustment of the rights, equities, and interests' of the parties as is consistent with substantial justice. (§ 871.5.) 'Under this section, the court has considerable discretion to select appropriate relief from the full range of equitable and legal remedies.' (Legislative Committee Comment — Assembly, to § 871.5.)" (*Southern Pac. Transportation, supra,* 58 Cal.App.3d at p. 437.)

The Court of Appeal continued: "The fact that damages is one of a full range of possible remedies does not guarantee [the plaintiffs] the right to a jury for their good faith improver action. We recognize that where a complaint raises both legal and equitable issues, a jury trial may be obtained upon the issues raised by the legal cause. [Citation.] Here, however, there is no possibility of severing the legal from the equitable. The trier of fact must determine whether to quiet title in the improver on the condition he pay to the landowner the value of the unimproved land, or whether and in what amount, to award

48

damages to the improver, or whether to require a completely different form of relief.  [Citation.]  Such a determination is not susceptible of division into one component to be resolved by the court and another component to be determined by a jury.  Only one decision can be made, and it must make a proper adjustment of the 'rights, equities, and interests' of all the parties involved." (*Southern Pac. Transportation, supra*, 58 Cal.App.3d at pp. 437-438.)

Under these circumstances the *Southern Pac. Transportation* court concluded:  "Because of the wide range of equitable and legal relief authorized by Code of Civil Procedure section 871.5, it would be an impossible task for a jury to determine the appropriate relief and to resolve the rights, equities, and interests of all of the parties. . . .   We have concluded, therefore, that it is the function of the court and not the jury to be the trier of fact in a good faith improver action." (*Southern Pac. Transportation, supra*, 58 Cal.App.3d at p. 438.)

In this court's subsequent decision in *C & K Engineering*, *supra*, 23 Cal.3d 1, we specifically cited and discussed the *Southern Pac. Transportation* decision with approval, quoting at some length the Court of Appeal's reasoning in that case. (*C & K Engineering, supra*, 23 Cal.3d at p. 11.)

In the second case, *DiPirro, supra*, 153 Cal.App.4th 150, the Court of Appeal addressed whether there is a right to a jury trial in an action seeking enforcement of the provisions of the Safe Drinking Water and Toxic Enforcement Act of 1986 (Health & Saf. Code, §§ 25249.5-25249.13), a legislative measure adopted by the voters through the initiative process and most

commonly known as Proposition 65.[18]  That measure — which generally prohibits businesses from (1) knowingly discharging chemicals known to cause cancer or reproductive toxicity into any source of drinking water (Health & Saf. Code, § 25249.5) or (2) knowingly exposing any individual to such chemicals without first giving clear and reasonable warning (*id.*, § 25249.6) — authorizes government officials and, under specified circumstances, private persons, to bring a cause of action seeking injunctive relief and civil penalties against any person who violates the statute.  (*Id.*, § 25249.7.)  Like the UCL and FAL, Proposition 65 provides that once a statutory violation is found, the court may issue an injunction and shall impose a civil penalty not to exceed $2,500 per day for each violation (Health & Saf. Code, § 25249.7, subds. (a), (b)(1)), and, again like the UCL and FAL, Proposition 65 sets forth a list of multiple factors, including "[a]ny other factor that justice may require," that the court is to consider in determining the amount of the civil penalties to be imposed.  (Health & Saf. Code, § 25249.7, subd. (b)(2)(G).)[19]  Because the determination whether a

---

[18]  The legislation was adopted by the voters at the November 4, 1986 General Election.  The Legislature has amended relevant provisions of the act on numerous occasions since its inception.  (See Stats. 1999, ch. 599, § 1; Stats. 2001, ch. 578, § 1; Stats. 2002, ch. 323, § 1; Stats. 2003, ch. 62, § 185; Stats. 2013, ch. 581, § 1; Stats. 2014, ch. 71, § 90; Stats. 2014, ch. 828, § 1; Stats 2017, ch. 510, § 1.)  For convenience, we shall refer to the legislation in its current form as Proposition 65.

[19]  Health & Safety Code section 25249.7, subdivision (b)(2) provides in full:  "In assessing the amount of a civil penalty for a violation of this chapter, the court shall consider all of the following:

statutory violation has been established itself triggers the availability of both injunctive relief and civil penalties, the equitable and legal aspects of the action are not severable.

In deciding whether the plaintiff had a right to a jury trial in the civil action authorized by Proposition 65, the *DiPirro* court examined the statutory scheme as a whole to determine whether the gist of the action was legal or equitable. (*DiPirro, supra,* 153 Cal.App.4th at pp. 180-184.) In concluding that the legislation is "thoroughly infused with equitable principles that must be considered and adjudicated in an enforcement action" (*id.* at p. 180), the court relied in part on the fact that "Proposition 65 is ' "a remedial statute intended to protect the public" ' " (*ibid.*), along with its determination that the remedies authorized by the act were primarily equitable in nature, including injunctive relief to prevent the sale of offending products that lack the required warning. (*Id.* at p. 181.)

The *DiPirro* court acknowledged that Proposition 65 also authorized an award of civil penalties (*DiPirro, supra,*

---

"(A) The nature and extent of the violation.

"(B) The number of, and severity of, the violations.

"(C) The economic effect of the penalty on the violator.

"(D) Whether the violator took good faith measures to comply with this chapter and the time these measures were taken.

"(E) The willfulness of the violator's misconduct.

"(F) The deterrent effect that the imposition of the penalty would have on both the violator and the regulated community as a whole.

"(G) Any other factor that justice may require."

153 Cal.App.4th at p. 181) and explicitly recognized " 'the "general rule" ' that monetary relief is a legal remedy, 'and an award of statutory damages may serve purposes traditionally associated with legal relief, such as compensation and punishment.' " (*Id.* at p. 182.) The Court of Appeal pointed out, however, that the civil penalties that are authorized by Proposition 65 are to be determined by a highly discretionary consideration of multiple factors "that do not primarily take into account any harm suffered by the plaintiff . . . [and are] the kind of calculation traditionally performed by judges rather than a jury . . . ." (*DiPirro*, at p. 182, fn. omitted.) Emphasizing that "[t]he Act is informational and preventative rather than compensatory in its nature and function" (*ibid*.) and that "[t]he primary right to bring an action for civil penalties pursuant to the Act is . . . given to the state rather than individuals seeking compensation" (*id.* at p. 183), the *DiPirro* court determined that "the statutory remedies afforded by the Act, including civil penalties, are not damages at law, but instead constitute equitable relief appropriate and incidental to enforcement of the Act, which do not entitle the plaintiff to a jury trial" (*id.* at p. 184).

### D. Application of Constitutional Principles to UCL and FAL Actions

As we shall explain, in light of the particular nature of the civil causes of action authorized by the UCL and FAL, we conclude that the gist of a civil action under the UCL and FAL is equitable rather than legal in nature. Such causes of action are equitable either when brought by a private party seeking only an injunction, restitution, or other equitable relief or when brought by the Attorney General, a district attorney, or other

governmental official seeking not only injunctive relief and restitution but also civil penalties. Accordingly, we conclude that there is no right to a jury trial in such actions under the California Constitution.

To begin with, the statutory causes of action established by the UCL and FAL are clearly not of like nature or of the same class as any common law right of action. (Cf. *One 1941 Chevrolet Coupe, supra*, 37 Cal.2d 832, 300.) As the leading treatise on California's consumer protection statutes explains, under the common law only a business adversely affected by trademark or trade name infringement by a business competitor could file an action for unfair competition against the competitor and such an action could be brought only as a suit in equity. (See Cal. Practice Guide: Stern, Bus. & Prof. Code § 17200 Practice, *supra*, § 2:1, p. 2-1.) "At common law, deceived consumers had no claim for unfair competition. This made little sense, since ultimately it is the consumer who is harmed by a business that passes off goods or services as genuine, or as those of another. . . . No matter; consumers were left without a claim or remedy. This was the era of *caveat emptor* [that is, let the buyer beware]." (*Id.*, § 2:3, p. 2-1)

The UCL and FAL were enacted for the specific purpose of creating new rights and remedies that were not available at common law. (See, e.g., *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1263-1264.) The statutes deliberately broaden the types of business practices that can properly be found to constitute unfair competition (see, e.g., *Barquis, supra*, 7 Cal.3d at p. 112), and eliminate a number of elements that were required in common law actions for fraud (see, e.g., *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 312; *Com. on Children's*

*Television*, *supra*, 35 Cal.3d 197, 211). The statutes explicitly authorize government officials and injured private individuals to obtain injunctive relief to prevent a business from continuing to use the practice to the detriment of other consumers and to obtain restitution and other clearly equitable relief. (Bus & Prof. Code, §§ 17203, 17204.) Such causes of action for unfair competition that authorize injunctive relief against unfair or deceptive business practices had no close or analogous counterpart at common law.

Furthermore, when the Legislature adopted the civil penalty provisions of the UCL and FAL in 1972 and 1965 respectively, permitting government officials, and government officials alone, to seek civil penalties along with injunctive or other equitable relief in the civil actions such officials bring under the UCL and FAL (see *Jayhill*, *supra*, 9 Cal.3d at p. 288), the causes of action under the UCL and FAL continued to constitute causes of action that were not of like nature or of the same class as any common law action. Prior to 1850, early English law embodied numerous statutes imposing civil penalties for a variety of specifically delineated impermissible business practices — like using false weights and measures in the sale of a product or failing to pay the appropriate excise taxes due — that were enforced by the government through a civil action in the Court of Exchequer in which a jury was available. (See *One 1941 Chevrolet Coupe*, *supra*, 37 Cal.2d at pp. 295-296 & fn. 15.) We are unaware, however, of any early English statute that defined the business conduct proscribed by the statute in the type of broad and sweeping language adopted in the UCL and FAL, which was specifically intended to reach novel but offensive business practices that were not

encompassed by more specific statutory prohibitions.  (See, e.g., *Barquis*, *supra*, 7 Cal.3d at p. 112.)  Furthermore, the early English statutes generally set forth a specific amount of civil penalty that was to be imposed for each violation; again, we are aware of no such statute that required the amount of the civil penalty to be determined by a consideration of multiple factors comparable to those set out in the relevant provisions of the UCL and FAL.  (Bus. & Prof. Code, §§ 17206, subd. (b), 17536, subd. (b).)  Finally, and perhaps most significantly, unlike the UCL and FAL, none of the early English statutes authorized a prosecuting official to seek and obtain, *in the same action*, a civil penalty and an injunction that would explicitly restrain the business from committing the prohibited conduct in the future.[20]

---

[20]     In his seminal article on the right to civil jury trial, Professor Fleming James observed that, at common law, when a plaintiff was seeking to obtain both injunctive relief and civil penalties for a defendant's alleged statutory violation, the plaintiff would have been required to bring two separate actions — one in equity and one in law.  As Professor James explained: "B's violation of A's statutory right . . . might entitle A to an injunction, to compensatory damages, and to a penalty.  The right to any relief would turn on whether B violated the statute.  A might get a determination of that issue without a jury in an equity suit, seeking an injunction and perhaps compensatory damages as incidental to an injunction.  Or he might get such determination in an action at law for damages or for the penalty.  Since equity refused to enforce a penalty and the law would not give an injunction, two suits would be required for complete relief.  A had the choice which to bring first.  And the first determination of the common issue (violation *vel non*) would bind the parties in the second action.  The plaintiff then had the power to choose the mode of trial of the common issue, and he could so exercise it as to leave no room for judicial discretion."

Accordingly, in the absence of a comparable common law counterpart, in deciding whether there is a right to a jury trial under the California Constitution, we must look to the statutory scheme as a whole to determine whether the gist of a cause of action under the UCL or the FAL seeking both injunctive relief and civil penalties is legal or equitable.

For nearly a half century, Court of Appeal decisions have explicitly and uniformly held that actions under the UCL and FAL are equitable in nature and are to be tried by the court and not by a jury, including when the remedies sought are civil penalties as well as injunctive or other equitable relief. (See, e.g., *People v. Witzerman* (1972) 29 Cal.App.3d 169, 176-177 (*Witzerman*); *People v. Bestline Products, Inc.* (1976) 61 Cal.App.3d 879, 915-916; *People v. First Federal Credit Corp.* (2002) 104 Cal.App.4th 721, 732-733; *People v. Bhakta, supra,* 162 Cal.App.4th 973, 977-979; *People ex rel. Feuer v. Superior Court (Cahuenga's The Spot)* (2015) 234 Cal.App.4th 1360, 1384.) Although this court has not previously been directly asked to decide this issue itself, we note that as recently as 2015, in *Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298, our court, in responding to the defendant's concern that the plaintiff's false advertising and unfair competition claims in that case "would be evaluated by a lay jury applying a nebulous

(James, *Right to a Jury Trial in Civil Actions* (1963) 72 Yale L.J. 655, 671-672, fns. omitted.) Thus, as a general matter, at common law when a plaintiff sought both injunctive relief and civil penalties based upon a business's alleged violation of a statute, the business was by no means guaranteed that the question whether it violated the statute would be determined by a jury rather than by a court.

'reasonable consumer' standard," stated that "these claims are decided by a judge, not a jury." (*Id.* at p. 322, citing *Hodge v. Superior Court* (2006) 145 Cal.App.4th 278, 284-285 [action brought by private plaintiff seeking equitable relief] and *Witzerman, supra,* 29 Cal.App.3d 169, 176-177 [action brought by public official seeking injunctive relief and civil penalties].)

The Court of Appeal decision under review here was the first appellate decision to reach a contrary conclusion. Although the Court of Appeal suggested that the numerous prior Court of Appeal decisions cited above were either not on point or did not fully analyze the jury trial issue (*Nationwide Biweekly, supra,* 24 Cal.App.5th at p. 457), our review of those appellate court decisions does not support the Court of Appeal's characterization of those decisions. Those prior decisions, contrary to the Court of Appeal's suggestion, directly analyze the question whether there is a right to a jury trial in such actions under the California Constitution and conclude that there is no state constitutional right to a jury trial in such actions.

The 1972 decision in *Witzerman, supra,* 29 Cal.App.3d 169 — the initial decision in this line of cases — demonstrates this point. *Witzerman* was an enforcement action brought by the Attorney General under the FAL seeking both injunctive relief and civil penalties. After noting that the defendants' jury trial claim relied on both the federal and state constitutional jury trial rights, the court initially addressed the state constitutional claim and rejected the defendants' argument that the trial court's denial of a jury trial was improper under the California Constitution because the issues to be tried were assertedly legal rather than equitable in nature. (*Witzerman,* at p. 176.) The

court in *Witzerman* explained: "Assuming, without so deciding, that the civil penalties sought represent legal rather than equitable relief, we do not believe that in this case such issues could have been severed from the equitable ones. The same alleged misconduct on the part of appellants was the basis for both types of relief sought by the People. (Cf. *Jaffe v. Albertson Co.* [(1966)] 243 Cal.App.2d 592, 610 [53 Cal.Rptr. 25].) Under these circumstances trial to the court of the People's case for injunctive relief disposed of as well the People's case for relief by way of civil penalties. (Cf. *Veale v. Piercy* [(1962)] 206 Cal.App.2d 557, 562-563 [24 Cal.Rptr. 91].)" (*Witzerman, supra,* 29 Cal.App.3d at pp. 176-177.) Contrary to the Court of Appeal's critique below, only after rejecting the defendants' state constitutional jury trial claim did the court in *Witzerman* turn to and reject the defendants' federal Sixth Amendment claim. (*Witzerman,* at p. 177.)

Although the *Witzerman* decision directly addressed and rejected the defendant's state constitutional jury trial claim, it is not clear that the decision applied the proper mode of analysis. After correctly observing that the equitable and legal aspects of the FAL action before it were nonseverable, the court did not explicitly apply the "gist of the action" test but instead appears to have applied the "equity first preference" doctrine. (*Witzerman, supra,* 29 Cal.App.3d at pp. 176-177.) Nonetheless, we conclude that the *Witzerman* court reached the correct result.

All parties before us agree that the legal and equitable aspects of the UCL and FAL actions at issue are nonseverable and that the gist of the action standard applies. The legal and equitable aspects of these actions are nonseverable not only because, as the *Witzerman* court indicated (*Witzerman, supra,*

29 Cal.App.3d at pp. 176-177), the determination whether a defendant's alleged conduct constitutes a violation of the statute provides the basis for all of the relief authorized by the statutes, but also because the amount of civil penalties that would be appropriate may well depend on the equitable remedies, including restitution, that are or are not imposed. (See, e.g., *Overstock.com, supra,* 12 Cal.App.5th 1064, 1088-1089; *People ex rel. Harris v. Sarpas* (2014) 225 Cal.App.4th 1539, 1567.)

With respect to the application of the gist of the action standard, our independent analysis of the UCL and FAL causes of action as a whole convinces us that the gist of the civil causes of action authorized by the UCL and FAL must properly be considered equitable, rather than legal, in nature.

To begin with, the bulk of the remedies provided for in the statutes — injunctive relief, restitution, and other clearly equitable remedies such as the appointment of a receiver (see Bus. & Prof. Code, §§ 17203, 17535) — are clearly equitable in nature. As the legislative history of both the UCL and FAL make clear, the primary objective of both statutes is preventive, authorizing the exercise of broad equitable authority to protect consumers from unfair or deceptive business practices and advertising.

Second, although the statutes also authorize in actions brought by the Attorney General, a district attorney, or other government officials (but not private parties), the imposition of civil penalties — a type of remedy that in some contexts is properly considered legal in nature — the UCL and FAL statutes specify that in assessing the amount of the civil penalty to be imposed under these statutes, the court is afforded broad discretion to consider a nonexclusive list of factors that include

the relative seriousness of the defendant's conduct and the potential deterrent effect of such penalties, the type of qualitative evaluation and weighing of a variety of factors that is typically undertaken by a court and not a jury. (Bus. & Prof. Code, §§ 17206, 17536.)   Notably, the civil penalties that may be awarded under the UCL and FAL, unlike the classic legal remedy of damages, are noncompensatory in nature; they require no showing of actual harm to consumers and are not based on the amount of losses incurred by the targets of unfair practices or misleading advertising.  Like the civil penalties at issue in *Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 147-148, although the civil penalties under the UCL and FAL "may have a punitive or deterrent aspect, their primary purpose is to secure obedience to statutes and regulations imposed to assure important public policy objectives. . . .   The focus of [both] statutory scheme[s] is *preventative*."   (*Kizer*, at p. 147-148, citation omitted.)  And like the civil penalties in *Kizer* (*id.* at p. 147), the civil penalties obtained by the government in actions under the UCL and FAL are to be utilized for the enforcement of the statutes in question.  (See Bus. & Prof. Code, §§ 17206, subd. (c), 17536, subd. (c).)

Finally, as discussed above (*ante,* pp. 14-21, 29-37), the expansive and broadly worded substantive standards that are to be applied in determining whether a challenged business practice or advertising is properly considered violative of the UCL or FAL call for the exercise of the flexibility and judicial expertise and experience that was traditionally applied by a court of equity.  Particularly in light of the equitable nature of the substantive standards that apply in UCL and FAL actions — both in actions brought by private parties and by government

60

officials — we conclude that the gist of the civil causes of action authorized by the UCL and FAL must properly be considered equitable in nature. Accordingly, we conclude that under the California Constitution, there is no right to a jury trial in a cause of action under the UCL and FAL, including when the action is brought by a government official and seeks both injunctive relief and civil penalties.

We emphasize that this conclusion does not deprive a defendant in a UCL or FAL action of any constitutional right afforded by the jury trial provision of the California Constitution. As we have explained (*ante*, p. 41), that constitutional provision grants the right to jury trial in actions " 'of like nature' " " 'or of the same class' " in which a jury trial was provided at common law in 1850, when the jury trial provision of the California Constitution was first adopted. (*One 1941 Chevrolet Coupe*, *supra*, 37 Cal.2d 283, 300.) The consumer protection actions authorized in the UCL and FAL are not of like nature or of the same class as an action that was triable by jury at common law. In actions like those under the UCL and FAL, in which the equitable and legal aspects are nonseverable, there is no constitutional right to a jury trial when, as here, the gist of the action is equitable rather than legal.

In sum, we conclude that there is no right to a jury trial under the California Constitution in a cause of action under the UCL or FAL, including an action in which civil penalties as well as an injunction or other equitable relief are sought. Because our conclusion rests in significant part on the fact that the substantive standards embodied in the UCL and FAL contemplate the exercise of the type of equitable discretion and judgment traditionally applied by a court of equity, we have no

occasion in this case to decide how the California constitutional jury trial provision applies to other statutory causes of action that authorize both injunctive relief and civil penalties.[21]

---

[21] In concluding that the gist of the causes of action created by the UCL and FAL is equitable even when civil penalties as well as injunctive relief are sought, we have relied on the specific attributes of the California UCL and FAL statutes, as well as the established understanding of the scope of the California constitutional jury trial provision.

Every other state has adopted consumer protection legislation somewhat comparable to the UCL and FAL. (See, e.g., Stern, Cal. Practice Guide: Bus. & Prof. Code § 17200 Practice, *supra*, §§ 2:54-2:62, pp. 2-22 to 2-24; Nat. Consumer Law Center, Unfair and Deceptive Acts and Practices (9th ed. 2016) § 1.1., p. 1.) Although the numerous unfair or deceptive practice statutes in other jurisdictions differ from the California statutes in a variety of respects, we note that a substantial majority of other state courts that have addressed the question whether there is a right to a jury trial in civil actions brought under those states' unfair or deceptive practice laws have concluded that there is no right to a jury trial in such actions. (See *Nunley v. State* (Ala. 1993) 628 So.2d 619, 621-622; *People v. Shifrin* (Colo.App. 2014) 342 P.3d 506, 512-513; *Associated Inv. Co. Ltd. Partnership v. Williams Assocs. IV* (Conn. 1994) 645 A.2d 505, 508-512; *Martin v. Heinold Commodities* (Ill. 1994) 643 N.E.2d 734, 753; *Nei v. Burley* (Mass. 1983) 446 N.E.2d 674, 678-679; *State by Humphrey v. Alpine Air Products, Inc.* (Minn.Ct.App. 1992) 490 N.W.2d 888, 895; *State ex rel. Douglas v. Schroeder* (Neb. 1986) 384 N.W.2d 626, 629-630; *State v. State Credit Assoc.* (Wn.Ct.App. 1983) 657 P.2d 327, 330.) Several states have reached a contrary conclusion, but none of those cases involved a statute that created a cause of action in which both injunctive relief as well as damages or civil penalties could be obtained. (See *Robinson v. McDougal* (Ohio Ct.App. 1988) 575 N.E.2d 469, 474; *State v. Credit Bureau of Loredo, Inc.* (Tex. 1975) 530 S.W.2d 288, 290-292; *State v.*

### E.  Inapplicability of *Tull*

As already noted, in reaching a contrary conclusion, the Court of Appeal relied heavily upon the United States Supreme Court's decision in *Tull*, *supra*, 481 U.S. 412.  As we explain, for a variety of reasons we conclude that the Court of Appeal's reliance upon *Tull* was unwarranted.

*Tull* involved a civil action filed by the federal government against a real estate developer, alleging that the developer had dumped fill on wetlands without a permit in violation of the federal Clean Water Act.  (33 U.S.C. § 1251 et seq.)  As authorized by that act, the government sought both injunctive relief (*id.*, § 1319(b)) and civil penalties (*id.*, § 1319(d)).  The court in *Tull* observed, however, that at the time the complaint in that case was filed the developer had sold most of the properties in question to a third party, and "[i]njunctive relief was therefore impractical except with regard to a small portion of the land." (*Tull*, *supra*, 481 U.S. at p. 415.)  After denying the developer's demand for a jury trial, the trial court conducted a 15-day bench trial, concluded that the property on which the defendant had admittedly dumped fill constituted "wetlands" within the meaning of the federal statute, and ultimately imposed injunctive relief and civil penalties on defendant.

On appeal, the United States Supreme Court reversed, concluding that the developer was entitled to a jury trial under the Seventh Amendment to the federal Constitution.  (*Tull*,

---

*Abbott Labs.* (Wis. 2012) 816 N.W.2d 145, 156-159.)   (See generally Annot., Constitutional Right to Jury Trial in Cause of Action under State Unfair or Deceptive Trade Practices Law (1997) 54 A.L.R.5th 631.)

*supra*, 481 U.S. at pp. 417-425.) The court in *Tull* acknowledged that a proceeding under the Clean Water Act seeking both injunctive relief and civil penalties is analogous to two different common law causes of action — an action to abate a nuisance in which there was no right to a jury trial and an action in debt to impose a civil penalty in which there was a right to a jury trial. (*Tull*, at pp. 420-421). However, the court concluded that it need not decide which common law action was the closer historical analog, because prior Supreme Court precedent established that "characterizing the relief sought is '[m]ore important' than finding a precisely analogous common-law cause of action in determining whether the Seventh Amendment guarantees a jury trial." (*Id.* at p. 421, citing *Curtis v. Loether* (1974) 415 U.S. 189, 196.)

Thereafter, in discussing the relief sought in the action, the court in *Tull* focused primarily on the civil penalties that had been sought and obtained in the action, emphasizing that "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law" (*Tull, supra*, 481 U.S. at p. 422) in which a jury trial was available. Although the government had also sought and obtained injunctive relief in the action, the *Tull* court observed that under the applicable federal statute the government was free to seek an equitable remedy independent of legal relief (*id.* at p. 425) and further explained that prior federal decisions established that "if a 'legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact. The right cannot be abridged by characterizing the legal claim as "incidental" to the equitable relief sought' " (*ibid.*, citing *Curtis v. Loether, supra*, 415 U.S. at p. 196, fn. 11). (See also,

e.g., *Ross v. Bernhard* (1970) 396 U.S. 531, 537-538 ["where equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims"]; *Dairy Queen v. Wood* (1962) 369 U.S. 469, 473 [requiring "that any legal issues for which a trial by jury is timely and properly demanded be submitted to a jury" "whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"]; *Beacon Theatres v. Westover* (1959) 359 U.S. 500, 510-511 ["only under the most imperative circumstances . . . can the right to a jury trial of legal issues be lost through prior determination of equitable claims"].) Thus, because prior federal decisions had interpreted the Seventh Amendment generally to require a jury trial whenever a legal claim is joined with an equitable claim, the court in *Tull* held that, for Seventh Amendment purposes, the fact that the government sought civil penalties in the action before it was itself sufficient to conclude that the developer had "a constitutional right to a jury trial to determine his liability on the legal claims." (*Tull, supra*, 481 U.S. at p. 425.)[22]

---

[22] Although the court in *Tull* held that the Seventh Amendment granted the developer a right to a jury trial on the issue of *liability*, the majority went on to hold that the Seventh Amendment did not require a jury trial on *the amount of civil penalties*. The majority explained that because "highly discretionary calculations that take into account multiple factors are necessary in order to set civil penalties under the Clean Water Act" and "[t]hese are the kinds of calculations traditionally performed by judges," "the Seventh Amendment

For a number of reasons, we conclude that the Court of Appeal erred in relying upon the *Tull* decision. First and most fundamentally, the decision in *Tull* rested exclusively on the United States Supreme Court's interpretation of the right to civil jury trial embodied in the Seventh Amendment to the United States Constitution. The federal civil jury trial provision of the Seventh Amendment applies only to civil trials in *federal court*; federal decisions explicitly hold that the civil jury trial provision of the Seventh Amendment does not apply to *state court proceedings*. (See, e.g., *Osborn v. Haley* (2007) 549 U.S. 225, 252, fn. 17; *Gasperini v. Ctr. For Humanities, Inc.* (1996) 518 U.S. 415, 432; *Curtis v. Loether, supra*, 415 U.S. at p. 192, fn. 6; *Minn. & St. Louis R. R. v. Bombolis* (1916) 241 U.S. 211, 217-223.) Instead, the right to jury trial in state court proceedings is governed by the provisions and judicial interpretation of each state's own constitutional jury trial provision.[23]

---

does not require a jury trial for that purpose in a civil action." (*Tull, supra*, 481 U.S. at p. 427.)

Justice Scalia, joined by Justice Stevens, dissented from the latter holding, objecting that by fashioning a civil action in which liability but not the amount of damages is to be decided by a jury, "the Court creates a form of civil adjudication I have never encountered." (*Tull, supra*, 481 U.S. at p. 428 (dis. opn. of Scalia, J.).)

[23] We note that since the decision in *Tull*, a number of state courts, in interpreting and applying their own state constitutional civil jury trial provisions, have concluded, unlike the *Tull* decision, that there is no right to a jury trial in statutory causes of action authorizing both injunctive relief and civil penalties. (See, e.g., *State ex rel. Darwin v. Arnett* (Ariz.Ct.App. 2014) 330 P.3d 996, 1002; *Commissioner of Environmental*

In California, the constitutional right to a civil jury trial under the California Constitution is entirely independent of the federal constitutional civil jury trial right under the Seventh Amendment (Cal. Const., art. I, § 24), and past California cases have not hesitated to decline to follow the federal interpretation of the Seventh Amendment when the federal interpretation has been found inconsistent with a proper reading of the California provision. (See, e.g., *Jehl v. Southern Pacific Co.* (1967) 66 Cal.2d 821, 835 & fn. 17; *Rankin v. Frebank Co.* (1975) 47 Cal.App.3d 75, 91-92.) The *Tull* decision rested on several points in which the federal interpretation of the Seventh Amendment departs from California's interpretation of the California jury trial provision.

Initially, unlike actions under the UCL and FAL in which the equitable (injunctive relief) and legal (criminal penalties) nature of the available remedies are unquestionably *nonseverable* features of a single cause of action (see *Jayhill, supra,* 9 Cal.3d at p. 288), in *Tull* the court held that under the applicable Clean Water Act, the equitable (injunctive relief) and

---

*Protection v. Connecticut Bldg. Wrecking Co.* (Conn. 1993) 629 A.2d 1116, 1121-1123; *Dept. of Environmental Protection v. Emerson* (Me. 1992) 616 A.2d 1268, 1271; *Dept. of Environmental Quality v. Morley* (Mich.Ct.App. 2015) 885 N.W.2d 892, 897; *State v. Irving Oil Corp.* (Vt. 2008) 955 A.2d 1098, 1106-1108; *State v. Evergreen Freedom Foundation* (Wn.Ct.App. 2002) 49 P.3d 894, 908-909.) A few states that have traditionally looked to the Seventh Amendment in interpreting their own state jury trial provision have followed *Tull.* (See, e.g., *Dept. of Revenue v. Printing House* (Fla. 1994) 644 So.2d 498, 500-501; *Bendick v. Cambio* (R.I. 1989) 558 A.2d 941, 943-944.)

legal (criminal penalties) remedies were *severable*. (See *Tull*, *supra*, 481 U.S. at p. 425 ["[T]he Government was free to seek an equitable remedy in addition to, or independent of, legal relief. Section 1319 [the relevant provision of the Clean Water Act] does not intertwine equitable relief with the imposition of civil penalties. Instead each kind of relief is separably authorized in a separate and distinct statutory provision. Subsection (b), providing injunctive relief, is independent of subsection (d), which provides only for civil penalties."].) And the *Tull* court went on to rely on the severable nature of the claims at issue in finding that the issue of liability was to be tried by a jury rather than by the court, because federal decisions dictate that in cases involving severable legal and equitable issues, the legal issues should be tried prior to the equitable issues. (*Tull*, *supra*, 481 U.S. at p. 425 ["In such a situation, if a 'legal claim is joined with an equitable claim, the right to jury trial on the legal claim . . . remains intact. . . . Thus, petitioner has a constitutional right to a jury trial to determine his liability on the legal claims"].) By contrast, as noted above, the governing California decisions hold that when the legal and equitable aspects are severable, there is a preference for trying the equitable issues first and that if common facts are resolved in a manner that obviates the need to try the legal issue, there is no right under the California Constitution to have the legal issues submitted to the jury. (See *ante*, pp. 43-44; *Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 156-158 [discussing difference in California and federal rules]; see also Hamilton, *Federalism and the State Civil Jury Rights* (2013) 65 Stan. L.Rev. 851, 864-865, 869-870 [same].) Thus, the conclusion reached in *Tull* under the Seventh Amendment is not

necessarily the same result as would follow under California law.

Moreover, the *Tull* court's analysis of the jury trial question also demonstrates a second difference between the interpretation and application of the federal and state constitutional civil jury trial provisions. As we have explained, in cases in which a cause of action contains nonseverable legal and equitable aspects, California cases undertake a qualitative, holistic analysis of the action in its entirety to determine whether the gist of the action is legal or equitable, that is, whether the legal or equitable aspects predominate. (See *ante*, pp. 44-51.)[24] In *Tull*, by contrast, the court, in determining that

_____

[24] California is by no means alone in employing a holistic, qualitative standard for determining whether an action involving both legal and equitable aspects should be characterized as legal or equitable for purposes of an applicable constitutional jury trial provision. (See, e.g., *Miller v. Carnation Co.* (Colo.App. 1973) 516 P.2d 661, 663 ["Where there are legal and equitable claims joined in the complaint the court must determine whether the basic thrust of the action is equitable or legal in nature"]; *Commissioner of Environmental Protection v. Connecticut Bldg. Wrecking Co.*, *supra*, 629 A.2d 1116, 1121 ["In a case that involves both legal and equitable claims, ' "whether the right to a jury trial attaches depends upon the relative importance of the two types of claims" ' "]; *Shaner v. Horizon Bancorp.* (N.J. 1989) 561 A.2d 1130, 1139 ["we have eschewed a focus solely on the remedy sought and have espoused a more eclectic view of the standards that serve to characterize the essential nature of a cause of action in giving meaning and scope to the right to a jury trial conferred by article I, paragraph 9 of the New Jersey Constitution"]; *Insurance Financial Services, Inc. v. So. Carolina Ins. Co.* (S.C. 1978) 247 S.E.2d 315, 318 ["Since the appellant has prayed for money damages in addition to seeking equitable relief, characterization of the action as

under the Seventh Amendment there is a right to a jury trial for the statutory cause of action for civil penalties at issue in that case, relied primarily on its determination that the civil penalties in question were intended, at least in part, to be punitive in nature, which in the court's view was apparently sufficient to render the action legal in nature and require a jury trial. (*Tull, supra,* 481 U.S. at pp. 422-424.) In reaching this conclusion, however, the *Tull* court did not take into account a number of nonseverable equitable aspects of the action for civil penalties at issue there. Thus, the court does not appear to have thought it at all significant that the civil penalties were also intended in part to further the equitable purpose of restitution. (*Ibid.*) Moreover, and significantly, the court did not consider that, unlike actions for civil penalties at common law that

---

equitable or legal depends on the appellant's 'main purpose' in bringing the action"]; *Norback v. Bd. of Directors of Church Extension Soc.* (Utah 1934) 37 P.2d 339, 345 ["If the issues are legal or the major issues legal, either party is entitled upon proper demand to a jury trial; but, if the issues are equitable or the major issues to be resolved by an application of equity, the legal issues being merely subsidiary, the action should be regarded as equitable and the rules of equity apply"]; *Brown v. Safeway Stores* (Wn. 1980) 617 P.2d 704, 709 ["In determining whether a case is primarily equitable in nature or is an action at law, the trial court is accorded wide discretion [which] should be exercised with reference to a variety of factors including, but not necessarily limited to, [seven factors set forth in an earlier Washington decision]"]; *Hyatt Bros. ex rel. Hyatt v. Hyatt* (Wyo. 1989) 769 P.2d 329, 333 ["the right to a jury trial in cases involving mixed issues of law and equity [is] resolved by examining the entire pleadings and all the issues raised to determine whether the action is *primarily legal in nature* or *primarily equitable in nature*"].)

typically provided a specific and fixed penalty for each violation, the civil penalties authorized by the statutory cause of action at issue in that case were to be determined by the equitable weighing and balancing of a number of factors similar to the list of factors set forth in the UCL and FAL (see *Tull*, *supra*, 481 U.S. at p. 422, fn. 8) — a determination that the *Tull* court itself recognized was more appropriate for a court than a jury. (*Id.* at p. 427.) Thus, rather than determining whether the statutory cause of action for civil penalties at issue should be characterized as legal or equitable by considering *all* of the legal and equitable aspects of that cause of action holistically, the *Tull* court somewhat artificially severed the cause of action for civil penalties into two parts — one that the court held is to be decided by a jury and one that is to be decided by the court — creating a novel type of cause of action that, as Justice Scalia's dissent in *Tull* pointed out, was unknown at common law. (*Id.* at pp. 427-428 (dis. opn. of Scalia, J.).) As *Tull* demonstrates, in applying the Seventh Amendment federal courts generally have not applied the type of holistic gist of the action standard that California decisions have utilized in applying California's constitutional jury trial provision, and thus the *Tull* decision is distinguishable from the case before us on this ground as well.

Finally, in addition to the differences attributable to disparate interpretations of the federal and state constitutional civil jury trial provisions, the decision in *Tull* is distinguishable from the present case in yet another significant respect. Unlike the relevant broadly worded and expansive substantive standards embodied in the UCL and FAL — which, as we have explained, call for the exercise of the type of equitable discretion and judgment traditionally employed by a court of equity —

under the statute at issue in *Tull*, the question of liability turned simply on the question whether the defendant had, without a permit, deposited fill into an area constituting "wetlands" within the meaning of the Clean Water Act. (*Tull*, *supra*, 481 U.S. at pp. 414-415.) The parties in *Tull* apparently did not dispute that the substantive statutory standard of liability at issue in that case involved the type of factual determination that in other contexts has traditionally been made by juries. Accordingly, the court in *Tull* had no occasion to decide whether a jury trial is constitutionally required under the Seventh Amendment *whenever* a statute permits the recovery of civil penalties, even when the applicable substantive statutory standard clearly contemplates the exercise of equitable judicial discretion and judgment. We note in this regard that when the court in *Tull* addressed a substantive standard as to which the exercise of such equitable discretion was contemplated — that is, in assessing the *amount* of civil penalties to be imposed through "highly discretionary calculations that take into account multiple factors . . . traditionally performed by judges" (*Tull*, at p. 427) — the *Tull* court found that the trial court could properly resolve that matter without violating the federal constitutional civil jury trial right. (*Ibid.*)

Because of the significant differences in the manner in which the federal and California constitutional civil jury trial provisions have been interpreted and applied and because the court in *Tull* did not address a statutory standard, like those involved in the UCL and FAL, which contemplates the exercise of the type of equitable discretion typically undertaken by a

72

court of equity, we conclude that the Court of Appeal's reliance upon the *Tull* decision was misplaced.[25]

---

[25] In its answer brief filed in this court, Nationwide maintains that if this court rejects its state constitutional claim, we should address the question whether it has a right to a jury trial under the Sixth or Seventh Amendment to the United States Constitution and should hold, notwithstanding the absence of federal decisional support, that it has a right to jury trial in a state court action under those federal provisions. The Court of Appeal did not address these issues, neither the petition for review nor any answer to the petition raised these issues, and thus we decline to address those issues. (See Cal. Rules of Court, rule 8.516(b)(1).)

## V. CONCLUSION

For the reasons set forth above, we conclude that in causes of action under the UCL or FAL seeking injunctive relief and civil penalties, the gist of the actions is equitable, and there is no right to a jury trial in such actions under California law either as a statutory or constitutional matter. Given the specific attributes of the UCL and FAL discussed above, we have no occasion to determine whether there is a right to a jury trial in other settings in which the government seeks injunctive relief and civil penalties under other statutes authorizing those remedies.

The judgment of the Court of Appeal, holding that Nationwide has a right to a jury trial under the California Constitution in such actions, is reversed and the matter is remanded to the Court of Appeal for further proceedings consistent with this opinion.


**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CHIN, J.**
**CORRIGAN, J.**
**GROBAN, J.**

NATIONWIDE BIWEEKLY ADMINISTRATION, INC. v.
SUPERIOR COURT

S250047


Concurring Opinion by Justice Kruger


I concur in the judgment. I agree with the majority that article I, section 16 of the California Constitution does not guarantee a jury trial in this action for equitable relief and civil penalties under the unfair competition law (UCL; Bus. & Prof. Code, § 17200 et seq.) and false advertising law (FAL; Bus. & Prof. Code, § 17500 et seq.). But I arrive at that conclusion by a somewhat different—and narrower—path.

As the majority notes, California courts have assumed for decades that the UCL and FAL create causes of action that are equitable in character and thus must be tried to a judge rather than a jury. This assumption only makes sense, since, at their inception, the only remedy under both statutes was injunctive relief, the quintessential equitable remedy. Even today, only equitable remedies are available to private parties who bring UCL and FAL actions. (Bus. & Prof. Code, §§ 17203 [injunction and restitution as remedies for UCL violation], 17535 [same for FAL].)

But many years after the statutes were first passed, the Legislature authorized certain public officials—including, primarily, the Attorney General and district attorneys—to seek civil penalties as well as injunctive relief. (Bus. & Prof. Code, §§ 17206 [UCL], 17536 [FAL].) This development has called into question the courts' long-held assumption about the availability of jury trial. That is because government actions seeking civil

penalties, generally speaking, sound in law rather than equity and thus carry with them a constitutional right of jury trial under both the Seventh Amendment to the United States Constitution (applicable in federal courts) and article I, section 16 of the California Constitution (applicable in state courts). (*Tull v. United States* (1987) 481 U.S. 412, 420 (*Tull*); *People v. One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 295 & fn. 15.)

It is not uncommon for the Legislature to enact a statutory cause of action that has some equitable features and some legal features. Our case law instructs that in such cases, we are to determine which feature predominates in defining its essential character—which, in the distinctive terminology of our precedents, represents the "gist" of the action. (*People v. One 1941 Chevrolet Coupe*, *supra*, 37 Cal.2d at p. 299; *C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 9.) If the gist is legal, then the parties are constitutionally entitled to a jury. If the gist is equitable, then they are not.[1]

---

[1] Despite what the term "gist" might otherwise call to mind, the aim of this inquiry is not to identify a single essential element at the action's theoretical core. We instead try to understand how the statutory cause of action, considered as a whole, relates to the historical division between law and equity, the goal being to place the cause of action appropriately among its possible historical analogues.

I do not believe federal law differs a great deal on this basic point. Though the majority reads *Tull* as establishing a strict rule that the plea for a legal remedy carries a jury trial right notwithstanding any other substantial equitable characteristics the action might have (maj. opn., *ante*, at pp. 67–69), I do not read *Tull* this way. The high court's case law has long made clear that the federal jury trial inquiry turns on a

Our cases also instruct that the nature of the remedies sought is an important—if not necessarily controlling—consideration in this analysis. (*C & K Engineering Contractors v. Amber Steel Co., supra*, 23 Cal.3d at p. 9.)  In some cases where plaintiffs seek both equitable and legal remedies, courts have determined whether jury trial is available by comparing the relative significance of the two kinds of remedies.  Where the government asks for massive penalties and only very minor injunctive restrictions on the defendant—or, conversely for highly burdensome injunctive orders and only nominal penalties—one form of relief might be deemed incidental to the other and the jury trial right recognized, or not, accordingly.  (Cf. *Tull, supra*, 481 U.S. at pp. 424–425 [where relief "would be limited primarily to civil penalties, since petitioner had already sold most of the properties at issue[, the] potential penalty of

---

holistic examination of both "the nature of the action and of the remedy sought"—a rule *Tull* cited without signaling any intent to depart from it.  (*Tull, supra*, 481 U.S. at p. 417; see also *id.* at p. 422, fn. 6 ["Our search is for a single historical analog, taking into consideration the nature of the cause of action and the remedy as two important factors."]; accord, e.g., *Feltner v. Columbia Pictures Television, Inc.* (1998) 523 U.S. 340, 348 [7th Amend. to the U.S. Const. intended to apply to actions " 'in which legal *rights* were to be ascertained and determined' " (italics omitted and added)].)

In any event, *Tull* is distinguishable from this case on other, more case-specific grounds, which I discuss later in this opinion.  We need not rely here on any broad generalizations about how, if at all, the federal approach to the civil jury right differs from California's.

$22 million hardly can be considered incidental to the modest equitable relief sought"].)

But that is not this case. The present case comes to us in an early procedural posture—on a motion to strike the jury trial demand from defendant's answer—and the parties dispute both the size of potential penalties and the significance of the injunctive relief sought. It does not appear possible here to characterize either form of relief as clearly predominant over, or incidental to, the other. We must therefore look more broadly at the bases for liability alleged in the complaint and the relationships between these causes of action and between the liability and remedy issues presented.

Taking this broader look at the UCL, I agree with the majority that the gist of the statutory action is equitable.[2] Whatever type of relief a government plaintiff might seek in a particular case, liability under the UCL inherently rests on equitable considerations—considerations of a sort that only the trial court can effectively weigh and determine. (Maj. opn., *ante*,

---

[2] The majority discusses the equitable character of the UCL and FAL in detail only in part III of the opinion, which addresses *statutory* jury trial rights. The majority concludes there that in enacting and amending both statutes, "the legislative history and legislative purpose of both statutes convincingly establish that the Legislature intended that such causes of action under these statutes would be tried by the court, exercising the traditional flexible discretion and judicial expertise of a court of equity . . . ." (Maj. opn., *ante*, at p. 10.) In its constitutional analysis, the majority simply cross-references this discussion. (*Id.* at p. 59.) Readers should not be confused, however, by this organizational choice: The Legislature's intent does not control whether there is a constitutional right to jury trial. (See *id.* at p. 39.)

at pp. 17–21.)  The central provision of the UCL, Business and Professions Code section 17200, prohibits "unfair competition," which it defines to include "unfair" business practices. Determining what is unfair calls on courts to exercise the sort of flexible discretion that characterized the courts of equity—a kind of judgment that juries have not historically made, nor are well suited to make.  It is hard to imagine drafting jury instructions, for example, to embody the "unfairness" test enunciated in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 187, which refers to "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit" of those laws.

The liability determinations at issue in *Tull* were of a different character.  The question was whether the defendant had, without a permit, dumped fill into an area constituting "wetlands" within the meaning of the Clean Water Act.  (*Tull*, *supra*, 481 U.S. at pp. 414–415.)  The statutory rules governing this determination were certainly complicated and technical. (See 33 U.S.C. § 1344(f); 33 C.F.R. § 328.3(b) (2020).)  But they did not call on the decisionmaker's equitable discretion, and no one in *Tull*, including the court, disputed that this was the type of factual determination that has traditionally been made by juries in otherwise appropriate cases.  Indeed, the Clean Water Act also provides for criminal penalties for willful or negligent violations (33 U.S.C. § 1319(c))—which means that in some set of Clean Water Act cases, the relevant factual disputes are, of necessity, resolved by juries.  *Tull* is thus distinguishable from this case by the nature of the liability decision there, which required only the determination of the historical facts and the application of legal standards to those facts—tasks central to

the traditional role of trial juries—in contrast to the balancing of interests typically called for in assessing liability under the UCL.

But here is where my analysis differs from the majority's: While UCL liability can readily be characterized as dependent on equitable considerations, I do not believe the same can be said of liability under the FAL. To be sure, the FAL, much like the UCL, is broadly written: The statute is designed to encompass any novel scheme for misleading the public. (Maj. opn., *ante*, at p. 29.) The statute makes claims relatively easy to prove, compared to common law fraud, by employing a negligence standard and omitting the elements of reliance and injury; the plaintiff need show only that the challenged advertisement or promotion is likely to mislead members of the public. (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 951.)[3] But at least by its text, the FAL does not create a standard of liability that depends on the exercise of a court's equitable judgment. No balancing of harms and benefits or weighing of the parties' and public interests are involved in determining liability; no

---

[3] Business and Professions Code section 17500 defines the scope of false advertising liability: "It is unlawful for any person . . . with intent directly or indirectly to dispose of real or personal property or to perform services . . . to make or disseminate or cause to be made or disseminated before the public . . . any statement, concerning that real or personal property or those services . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person . . . to so make . . . any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised."

equitable principles like laches or unclean hands come into play. Rather, as other state courts have observed in evaluating similar laws, the FAL in significant respects resembles the common law cause of action for negligent misrepresentation, a species of the tort of deceit.  (See *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 407; cf. *State v. Abbott Laboratories* (2012) 341 Wis.2d 510, 533 [816 N.W.2d 145, 156] [holding that Wisconsin's Deceptive Trade Practices Act, as "an essential counterpart to the common law claim of 'cheating,'" carries a right to jury trial].)  Though the FAL requires only a misleading advertisement, not necessarily one containing express falsehoods, the same is true for tortious deceit in California. (*Universal By-Products, Inc. v. City of Modesto* (1974) 43 Cal.App.3d 145, 151 ["A misrepresentation need not be express but may be implied by or inferred from the circumstances."]; *Sullivan v. Helbing* (1924) 66 Cal.App. 478, 483 ["Fraudulent representations may consist of half-truths calculated to deceive. Thus a representation literally true is actionable if used to create an impression substantially false."].)  At least considered in isolation, then, nothing about the nature of liability determination under the FAL suggests it sits beyond the scope of the jury right.

In characterizing the nature of the FAL action as equitable, the majority emphasizes that appellate courts analyzing FAL liability have discussed a "variety of factors" relevant to whether a particular advertisement is misleading. (Maj. opn., *ante*, at p. 31.)  These appellate discussions, though, tell us little about the legal or equitable character of FAL liability.  The issues before the appellate courts were ones of legal sufficiency:  whether allegations of misleading advertising

7

were sufficient to survive demurrer (*Brady v. Bayer Corp.* (2018) 26 Cal.App.5th 1156; *Day v. AT & T Corp.* (1998) 63 Cal.App.4th 325) or whether substantial evidence supported a trial court's finding of an FAL violation (*People v. Overstock.com, Inc.* (2017) 12 Cal.App.5th 1064 (*Overstock.com*)). In answering these questions, the courts did cite a number of factual considerations that supported the complaint's or evidentiary showing's sufficiency, but those factual discussions are not particularly suggestive of an inherently equitable approach to FAL liability. What the appellate courts did in these cases does not differ in any meaningful way from what courts do when they review evidentiary sufficiency questions in cases involving causes of action that are tried to juries, such as common law fraud. (See, e.g., *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 393 [in suit for fraudulent inducement to enter into at-will employment contract, evidence was insufficient to show reliance where employment offer did not specifically guarantee the plaintiff "would be employed there so long as his work was satisfactory or that he could be fired only for good cause" or contain any other "promises of long-term employment"]; *AREI II Cases* (2013) 216 Cal.App.4th 1004, 1022 [detailing several "facts and circumstances that permit a reasonable inference" defendant participated in fraud].) Indeed, even in criminal cases tried to juries, appellate decisions on sufficiency of evidence often articulate a number of factual considerations to guide the analysis. (See, e.g., *People v. Banks* (2015) 61 Cal.4th 788, 804–811 [detailed analysis of sufficiency of evidence to show major participation in felony and reckless indifference to human life]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1081–1082

[discussing three nonexclusive factors relevant to sufficiency of evidence for premeditation and deliberation].)

None of the cases the majority cites discusses the possibility of a jury trial when civil penalties are sought. Indeed, the only case in which the issue could have arisen is *Overstock.com*—the only action brought by a public plaintiff entitled to seek civil penalties—but it was not raised there. Nor do any of the cases hold or state that determining an FAL violation requires weighing competing interests, applying equitable doctrines such as laches, estoppel, or unclean hands, or balancing the harms and benefits of a requested remedy. Indeed, the considerations discussed in the opinions appear fairly typical of issues that, in a jury trial, might be used by the jury to resolve the question of liability under the FAL: the inability of consumers to learn the terms of a prepaid phone card before buying the card (*Day v. AT & T Corp.*, *supra*, 63 Cal.App.4th at p. 334); the application of "common sense" (*Brady v. Bayer Corp.*, *supra*, 26 Cal.App.5th at p. 1165); the possibility that a brand name by itself would mislead consumers (*id.* at p. 1170); and the likelihood a consumer would understand " 'Compare at' " in an advertisement boasting of a low price to refer to another seller's price for the same item (*Overstock.com*, *supra*, 12 Cal.App.5th at p. 1081).

The *Overstock.com* court did cite as consistent with its own analysis a regulation of the Federal Trade Commission (FTC), part of the agency's Guides Against Deceptive Pricing (FTC Guides), stating that price comparisons to other merchandise can be " 'useful and legitimate' " when the comparison items are of essentially similar quality and are obtainable in the area. (*Overstock.com*, *supra*, 12 Cal.App.5th at p. 1081, quoting 16

C.F.R. § 233.2(c) (2017).) The majority holds this up as an example of how "the complexities and nuances" of FAL liability "are often ameliorated by judicial reference to the relevant guidelines developed by the FTC regarding deceptive advertising." (Maj. opn., *ante*, at p. 34, citing Stern, Cal. Practice Guide: Bus. & Prof. Code § 17200 Practice (The Rutter Group 2019) §§ 4:46–4:80.4, pp. 4-14–4-32.)

This overstates the significance of the FTC Guides to the question before us. For one thing, the link between the FTC Guides and liability under the FAL appears rather tenuous. The FTC Guides are not comprehensive or definitive regulations even for interpreting the FTC Act, and certainly nothing suggests they were intended, or have functioned, to define deceptive practices for purposes of state law.[4] In any event, while the FTC Guides offer guidance on what sort of practices will be considered deceptive, none of this guidance appears to turn on the application of equitable judgment. For example, the

---

[4]     The FTC Guides on testimonials and endorsements, for example, simply "provide the basis for voluntary compliance with the law by advertisers and endorsers." (16 C.F.R. § 255.0(a) (2020); see also *id.*, § 260.1(a) (2020) [Guides on environmental claims "help marketers avoid making environmental marketing claims that are unfair or deceptive," but "do not operate to bind the FTC or the public."]; *FTC v. Mary Carter Paint Co.* (1965) 382 U.S. 46, 47–48 ["These, of course, were guides, not fixed rules as such, and were designed to inform businessmen of the factors which would guide Commission decision."].) And while the Stern treatise describes some of the FTC Guides as potentially relevant to FAL liability, it gives no examples of their use by courts for this purpose and does not describe such use as common. (See Stern, Cal. Practice Guide: Bus. & Prof. Code § 17200 Practice, *supra*, §§ 4:46, 4:72, 4:80.2–4:80.4.)

Guides Concerning Use of Endorsements and Testimonials in Advertising, which the majority describes as illustrating the type of "equitable consideration" that goes into an FAL liability determination (maj. opn., *ante*, at p. 35), covers such questions as when an advertiser should confirm that the endorser's views have not changed (16 C.F.R. § 255.1(b) (2020)) and what kind of substantiation must support the claims of effectiveness implied by a consumer endorsement (*id.*, § 255.2(a), (b) (2020)). The FTC Guides illustrate the potential factual complexity of deceptive advertising claims, but they do not support the majority's conclusion that deciding the merits of an FAL claim "depends upon the exercise of the type of equitable discretion and judgment typically employed by a court of equity." (Maj. opn., *ante*, at pp. 36–37.)[5]

The majority also argues that because of the FAL's potential breadth, it is important that the FAL liability standard be administered by trial courts, which can "set forth their reasoning for a determination that the FAL has been violated so that a body of precedent can evolve to inform businesses of advertising practices they must avoid." (Maj. opn., *ante*, at p. 31.) As an argument for cabining the scope of the constitutional jury trial right, I find this reasoning unpersuasive. Binding precedent is made only by appellate courts, and an appellate decision on sufficiency of the evidence

---

[5] The same is true of the cited federal decisions upholding FTC findings of deceptiveness (maj. opn., *ante*, at p. 37), such as *FTC v. Colgate-Palmolive Co.* (1965) 380 U.S. 374, 384–390 and *FTC v. Mary Carter Paint Co., supra*, 382 U.S. at pages 47 to 48: They may show that deceptiveness can be factually complicated, but not that it depends on application of equitable principles.

fills out the precedential picture regardless of whether trial was to a jury or to the bench. And while it might be thought desirable from some points of view to have all FAL actions heard by judges, the same might be said for any number of civil causes of action. Defendants in insurance bad faith cases, for example, might well prefer bench trials and could argue that they, too, need a body of precedent to guide their actions. But they get such precedential guidance from appellate decisions on legal issues. (E.g., *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 721–726 [propriety of summary judgment].) It would not be consistent with the constitutional mandate that trial by jury "is an inviolate right and shall be secured to all" (Cal. Const., art. I, § 16) for us to pick out categories of civil actions that, because they sometimes raise complicated factual issues or implicate common business decisions, we regard as more suitable for trial to the court.

In the end, however, while it seems to me the majority comes up short in its effort to show that FAL claims implicate inherently equitable judgment uniquely suited to a court, I agree that the present action was nonetheless predominantly equitable in character.

First, as the majority explains, even if liability for civil penalties is deemed a legal question, the amount of such penalties under the UCL and FAL is decided by the court on an equitable basis, along with questions of injunctive relief and appropriate restitution. (Maj. opn., *ante*, at p. 58 ["[T]he UCL and FAL statutes specify that in assessing the amount of the civil penalty to be imposed under these statutes, the court is afforded broad discretion to consider a nonexclusive list of factors that include the relative seriousness of the defendant's

conduct and the potential deterrent effect of such penalties, the type of qualitative evaluation and weighing of a variety of factors that is typically undertaken by a court and not a jury. (Bus. & Prof. Code, §§ 17206, 17536.)"].) The parties do not dispute that even if the request for civil penalties triggered a jury trial right, the right would extend only to the trial on liability; the ultimate amount of any penalties awarded would be decided by the court. Such an arrangement is not unprecedented (see *Tull*, *supra*, 481 U.S. at pp. 425–427), but this allocation of remedial authority does diminish the practical importance of the jury's factfinding role and, in my view, strains the idea that the gist of the action is predominantly legal.

Second, and equally important, the causes of action under the UCL and the FAL are inherently intertwined. This is because "unfair" competition under the UCL expressly includes "any act prohibited by" the FAL (Bus. & Prof. Code, § 17200), meaning that every violation of the FAL is therefore also a violation of the UCL. When, as here, allegedly deceptive conduct is pleaded as a violation of both statutes, the same liability questions that a jury would decide for purposes of the FAL would be decided by the court for purposes of the UCL. And while it might be theoretically possible to separate out the UCL claims that depend on equitable principles from those that do not, in practice the effort to keep the claims separate would be bound to collapse, since each UCL cause of action in a complaint is not necessarily limited to a single type of conduct or a single legal theory of liability.

In these circumstances, trying liability under the FAL to the jury, while the rest of the action was decided by the court, would create procedural complications without significant

benefit to the defendant demanding jury trial. Because the FAL and the UCL are intertwined in this manner, a trial court that considered the defendant's advertising deceptive could impose liability under the UCL before even putting the FAL liability question to the jury. (See maj. opn., *ante*, at p. 43 [trial court has discretion as to order of trying severable legal and equitable issue].) The court could then exercise its equitable judgment to impose both injunctive relief and substantial civil penalties for the UCL violation, regardless of the jury's view as to FAL liability. In other words, although every found violation of the FAL triggers civil penalties under the UCL, the inverse is not true; a jury's finding of no FAL liability would not preclude a judge from awarding substantial civil penalties under the UCL. Because of the way these intertwined causes of action relate when the same conduct is at issue, the jury's verdict does not ultimately determine whether civil penalties are imposed.

Plaintiffs here seek a traditionally legal remedy, civil penalties, along with the equitable remedies of injunction and restitution. They also plead causes of action under the FAL, for which liability appears to rest on factual determinations rather than equitable judgment, as well as the UCL. But in the end, the equitable facets of this action predominate over the legal ones. The amount of any civil penalties would be determined by the trial court on the basis of equitable principles, allowing the court to all but nullify any jury finding of an FAL violation. What is more, the court could effectively override any jury decision *against* FAL liability by imposing liability for the same conduct under the UCL before the FAL issue is ever tried, then awarding plaintiffs injunctive relief and penalties for that

violation.  For these reasons, I agree with the majority that the action is predominantly equitable in nature.


                                                      **KRUGER, J.**

**We Concur:**

**LIU, J.**
**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Nationwide Biweekly Administration, Inc. v. Superior Court
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 24 Cal.App.5th 438
**Rehearing Granted**

_____

**Opinion No.** S250047
**Date Filed:** April 30, 2020
_____

**Court:** Superior
**County:** Alameda
**Judge:** George C. Hernandez, Jr.

_____

**Counsel:**

Law Office of Alan S. Yockelson, Alan S. Yockelson; Ponist Law Group, Sean E. Poinst; Jones Day, Nathaniel Garrett and James R. Saywell for Petitioners.

No appearance for Respondent.

Jeannine M. Pacioni and Dean D. Flippo, District Attorneys (Monterey), Cynthia J. Zimmer and Lisa Green, District Attorneys (Kern), Nancy E. O'Malley, District Attorney (Alameda), Lori Frugoli, Edward Berberian and Jeremy M. Fonseca, District Attorneys (Marin), Matthew L. Beltramo, Assistant District Attorney (Alameda), John F. Hubanks and Christopher Judge, Deputy District Attorneys (Monterey), John Thomas Mitchell, Deputy District Attorney (Kern), Andres H. Perez, Deputy District Attorney (Marin); Mary Ann Smith, Sean Rooney, Robert R. Lux and William Horsey for Real Party in Interest.

Xavier Becerra, Attorney General, Nicklas A. Akers, Assistant Attorney General, Michele Van Gelderen, Sheldon H. Jaffe and Vivian F. Wang, Deputy Attorneys General, for the Attorney General as Amicus Curiae on behalf of Real Party in Interest.

Mark Zahner; Matthew T. Cheever, Deputy District Attorney (Sonoma) and Patrick Collins, Deputy District Attorney (Napa) for California District Attorneys Association as Amicus Curiae on behalf of Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

James R. Saywell
Jones Day
901 Lakeside Avenue East
Cleveland, OH 44144
(216) 586-3939

Matthew Beltramo
Assistant District Attorney
7677 Oakport St., Suite 650
Oakland, CA 94621
(510) 383-8600